**Jose and Rosa ROLO; and Dr. William and Roseanne Tenerelli, Plaintiffs,**

**v.**

**CITY INVESTING COMPANY LIQUIDATING TRUST, et al., Defendants.**

**Civ. No. 90–4420 (DRD).**

United States District Court, D. New Jersey.

Dec. 27, 1993.

As Amended Jan. 19, 1994.

Roy A. Heimlich, Herbert I. Deutsch, Vincent R. Coffey, Alfred N. Metz, Deutsch & Frey, New York City, and William O'Brien, Glenn P. Callahan, Callahan, Delany & O'Brien, Voorhees, NJ, for plaintiffs.

Paul M. Dodyk, Cravath, Swaine & Moore, New York City, and Bruce Rosen, Matthew P. Boylan, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendants City Investing Co. Liquidating Trust, AmBase Corp., Carteret Bancorp. Inc., George T. Scharffenberger, Marshall Manley, Edwin I. Hatch and Eben W. Pyne.

Steven M. Edwards, Davis, Scott, Weber & Edwards, P.C., New York City, for defendant David F. Brown.

Joel Hirschhorn, Douglas Centre, Coral Gables, FL, for defendant Robert Ehrling.

Robert T. Wright, Elizabeth C. Barber, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, FL, and Joseph L. Buckley and Mark E. Duckstein, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, NJ, for defendants Reubin O'D. Askew, Howard L. Clark Jr., Charles J. Simons and Peter R. Brinckerhoff.

Douglas S. Eakeley, Jeffrey J. Miller, Riker Danzig Scherer Hyland & Perretti, Morristown, NJ, for defendants Cravath, Swaine & Moore and David G. Ormsby.

Alan J. Kluger, Terri E. Tuchman, Kluger, Peretz, Kaplan & Berlin, P.A., Miami, FL, and Marshall Stoddard, Kelley Drye & War-

ren, Los Angeles, CA, and Kelley Drye & Warren, New York City, for defendant Greyhound Financial Corp.

Jeffrey S. Cook, Marshall Stoddard and Joseph A. Boyle, Kelley Drye & Warren, Parsippany, NJ, for defendants Greyhound Financial Corp. and Nat. Bank of Canada.

Louis L. Mrachek, Gunster, Yoakley & Stewart, P.A., West Palm Beach, FL, for defendant Nat. Bank of Canada.

Robert Young, Carlton, Field, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, FL, for defendant Harbor Federal Sav. & Loan Ass'n.

Faith R. Greenfield, Michael Araten, Blank, Rome, Comisky & McCauley, Cherry Hill, NJ, for defendants The Oxford Finance Companies, Oxford First Trust Corp. and Harbor Federal Sav. & Loan Ass'n.

Marbury Rainer, Jay Basham, Parker, Hudson, Rainer & Dobbs, Atlanta, GA, and James A. Scarpone, Stephen L. Dreyfuss, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for defendant Stanchart Business Credit, Inc.

David T. Eames, G. Wade Leak, Bodian & Eames New York City, and Paul Brickfield, Hackensack, NJ, for defendant Lloyds Bank.

John W. Little, Steel, Hector & Davis, West Palm Beach, FL, and Joseph J. Schiavone, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, for defendant Federal Nat. Mortg. Ass'n.

George Kielman, Sr. Counsel, Federal Home Loan Mortg. Corp., McLean, VA, and Gerald T. Ford, Siff, Rosen & Parker, Newark, NJ, for defendant Federal Home Loan Mortg. Corp.

Laura Besvinick, Greer Homer & Bonner, Miami, FL, and Edward J. Boccher, Mudge, Rose, Guthrie, Alexander & Ferdon, Parsippany, NJ, for defendant Citizens and Southern Trust Co. (Florida), Nat. Ass'n (Nations Bank).

Vincent E. Reilly, McElroy, Deutsch & Mulvaney, Morristown, NJ, for defendant Secor Nat. Bank.

Herschel E. Sparks Jr., Hughes, Hubbard & Reed, Miami, FL, and Norman C. Kleinberg, Susan Epstein, Steven Hammond, Hughes, Hubbard & Reed, New York City, and Clyde A. Szuch, Pitney, Hardin Kipp & Szuch, Morristown, NJ, for defendant the Home Ins. Co.

Gerald J. Houlihan, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Miami, FL, and Harold I. Braff, Keith Harris, Braff, Harris & Sukoneck, Livingston, NJ, for defendant Chase Federal Bank.

Howard B. Levi, Kornstein Veisz & Wexler, New York City, and Robert Klivane, First Nat. Bank of Boston Law Office, Boston, MA, and Steven I. Adler, Cole, Schotz, Bernstein, Meisel & Forman, Hackensack, NJ, for defendant First Nat. Bank of Boston.

Paul G. Gizzi, Mary B. Corrarino, Kirkpatrick & Lockhart, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith Inc.

Kevin M. Hart, Stark & Stark, P.C., Princeton, NJ, for F.D.I.C., as receiver for defendant Southeast Bank, N.A.

Louis W. Childress, Brown & Childress, East Orange, NJ, and Peter J. Pizzi, John H. Denton, Connell, Foley & Geiser, Roseland, NJ, for R.T.C., as receiver for defendant Carteret Sav. Bank, F.A.

George J. Wade, Thomas F. Swift, F. Russell DuPuy, Shearman & Sterling, New York City, and Steven M. Richman, Herrick, Feinstein, Princeton, NJ, for defendant Citicorp Real Estate, Inc.

Steven H. Reisberg, Willkie, Farr & Gallagher, New York City, and Robert E. Bartkus, Pinto, Rodgers & Kopf, Morristown, NJ, for defendant Prudential Ins. Co. of America.

James J. Hagan, Bruce D. Angiolillo, Simpson Thacher & Bartlett, New York City, and James M. Altieri, Shanley & Fisher, P.C., Morristown, NJ, for defendant Paine-Webber Inc.

*OPINION*

DEBEVOISE, District Judge.

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | INTRODUCTION | 193 |
| II. | JURISDICTION AND VENUE | 194 |
| III. | PROCEDURAL HISTORY | 194 |
| IV. | THE PARTIES | 195 |
| | A. THE PLAINTIFFS | 195 |
| | B. THE DEFENDANTS | 195 |
| V. | FACTUAL HISTORY | 196 |
| | A. THE GDC SCHEME | 196 |
| | 1. Targeting Prospective Lot Purchasers | 197 |
| | 2. House Sales Schemes | 198 |
| | 3. Purchaser Defaults and GDC Recycling of Lots | 199 |
| | B. THE ALLEGED PARTICIPANTS IN THE SCHEME | 201 |
| | 1. The City Defendants | 201 |
| | 2. The Inside Director Defendants and Director Defendants | 205 |
| | 3. The Financing Defendants | 206 |
| | 4. The Mortgagee Defendants | 208 |
| | 5. The Lot Contract Defendants | 211 |
| | 6. Cravath and Ormsby | 211 |
| VI. | DISCUSSION | 212 |
| | A. MOTION TO DISMISS UNDER RULE 12(b)(2) | 213 |
| | B. MOTIONS TO DISMISS UNDER RULE 12(b)(6) | 216 |
| | 1. Standard of Review | 216 |
| | 2. Interstate Land Sales Full Disclosure Act (Count III) | 217 |
| | a. Aider and Abettor Liability under the Land Sales Act | 217 |
| | b. Disposition of Motions to Dismiss | 220 |
| | c. Statute of Limitations | 223 |
| | d. Summary of Count III Rulings | 224 |
| | 3. Civil RICO (Count I) | 224 |
| | a. The Amended Complaint | 225 |
| | b. The Revised RICO Allegations | 226 |
| | i. Primary Liability under the Revised RICO Allegations | 227 |
| | ii. Aider and Abettor Liability under the Revised RICO Allegations | 230 |
| | c. Statute of Limitations | 234 |
| | 4. Securities Laws (Count II) | 235 |
| | a. The Instruments are Not Securities | 236 |
| | b. Statute of Limitations | 243 |
| | 5. Common Law Fraud (Count VII) | 246 |
| VII. | CONCLUSION | 247 |

---

## I. INTRODUCTION

Plaintiffs in this action are Jose and Rosa Rolo and Dr. William and Roseanne Tenerelli. They seek money damages and equitable relief on behalf of themselves and on behalf of others who purchased lots and/or houses in Florida from General Development Corporation ("GDC") and GDV Financial Corporation ("GDV") and who are members of the North Port Out-of-State Lot Owner Association (the "Association").

In general terms, the First Amended Complaint charges that GDC and its related corporations engaged in a nationwide fraudulent marketing scheme to induce plaintiffs and other members of the Association to purchase lots and houses in Florida at inflated prices. The defendants in this case are various corporate entities and individuals who, plaintiffs allege, participated in the scheme.

There are presently pending a variety of defense motions addressed to jurisdiction and to the complaint. City Trust, AmBase, Scharffenberger, Manley, Hatch and Pyne also move to dismiss under Rule 12(b)(2). Similarly defendants Askew, Brinckerhoff, Clark and Simons, who were outside directors, moved for dismissal pursuant to

Rule 12(b)(2). There is also pending plaintiffs' motion for class certification. This opinion addresses the defense motions. The class certification motion is rendered moot by the disposition of the defense motions.

## II. JURISDICTION AND VENUE

This court has subject matter jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964; Section 1420 of the Interstate Land Sales Full Disclosure Act (the "Land Sales Act"), 15 U.S.C. § 1719; Section 27 of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78aa; and the principles of pendent jurisdiction. Venue is proper pursuant to 28 U.S.C. § 1391, 15 U.S.C. § 1719 and 18 U.S.C. § 1965.

## III. PROCEDURAL HISTORY

On August 9, 1989, the named plaintiffs filed a complaint commencing an action entitled *Rolo v. General Dev. Corp.,* No. 89–3373 (D.N.J.1989) ("*Rolo I* "), alleging that GDC had engaged in a fraudulent marketing scheme during the period of 1956 to 1987. The complaint in *Rolo I* listed more than 3,000 named plaintiffs, each of whom alleged that he or she was deceived by GDC in connection with the purchase of Florida real estate. On September 7, 1989, plaintiffs filed an amended complaint, in which they asserted the following causes of action: fraud and breach of contract; federal RICO violations; federal securities violations; violations of the Land Sales Act; breach of fiduciary duty; and violations of state RICO statutes of New Jersey, Connecticut, Florida, New York, Ohio and Pennsylvania.

On October 31, 1989, the *Rolo I* defendants filed three separate notices of motion: (1) for an order dismissing the complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6); (2) for an order transferring the action to the United States District Court for either the Southern or Middle District of Florida; and (3) for an order severing from this action all of the named plaintiffs except Mr. and Mrs. Rolo pursuant to Fed.R.Civ.P. 21. In an opinion dated January 8, 1990, the court ruled only on defendants' Rule 9(b) motion to dismiss, and agreed with defendants that plaintiffs' complaint had failed to plead fraud with sufficient particularity. On January 19, 1990, the District Court ordered plaintiffs to submit a second amended complaint within 120 days. However, plaintiffs did not file their second amended complaint in *Rolo I* because on April 6, 1990, GDC filed a Chapter 11 bankruptcy petition. The court entered an order administratively terminating that action on April 16, 1990. *See Rolo v. General Dev. Corp., et al.,* 949 F.2d 695, 698 (3d Cir.1992) (wherein plaintiffs appealed the district court's decisions to stay both their damage suit pending defendants' bankruptcy and criminal proceedings and their application for a preliminary injunction).

On November 8, 1990, plaintiffs filed a complaint in the present action ("*Rolo II* "). While plaintiffs allege the same fraudulent marketing scheme and assert substantially the same causes of action as set forth in their prior suit,[1] *Rolo II* is different from *Rolo I* in three respects. First, unlike *Rolo I, Rolo II* is styled as a class action on behalf of members of the Association, a group comprised of more than 4,000 individuals who purchased property from GDC and its agents. Second, since all actions against GDC are currently stayed because of the Chapter 11 bankruptcy proceedings, the *Rolo II* Amended Complaint does not name GDC or GDV as defendants. *See In re General Dev. Corp., et al.,* 124 B.R. 376 (Bankr.S.D.Fla.) (the "GDC/GDV Bankruptcy Action"); *see also* 11 U.S.C. § 362; Am.Compl. at ¶ 37. Third, *Rolo II* names a number of new defendants.

In 1990, GDC and GDV, along with four corporate officers, including GDC directors David F. Brown and Robert F. Ehrling, were indicted for criminal violations for many of the acts complained of in the Amended Complaint. Criminal proceedings against GDC

---

1. Allegations in the *Rolo II* complaint, as amended on April 4, 1991 (the "Am.Compl."), are: violations of federal RICO laws, the Securities Act and the Land Sales Act, breach of an implied covenant of good faith, negligence, negligent misrepresentation and common law fraud. On June 25, 1993, plaintiffs withdrew their claims of breach of an implied covenant of good faith, negligence and negligent misrepresentation.

and GDV culminated in a plea agreement which led to GDC pleading guilty to one count of conspiracy to commit mail fraud in return for the dismissal of the remaining counts against them. As part of the GDC plea agreement the court dismissed all counts of the indictment against GDV. *See United States v. General Dev. Corp., et al.,* No. 90–0175 (M.D.Fla.) (the "GDC/GDV Criminal Action"). After a trial GDC's four officers were convicted and sentenced. Appeals from the convictions are pending. While GDC and GDV are no longer defendants in the instant case, the Amended Complaint still names directors Brown and Ehrling as defendants.

## IV. THE PARTIES

### A. *THE PLAINTIFFS*

Plaintiffs Jose and Rosa Rolo are residents of the State of New Jersey, and purchased Lot 26, Block 2297 at GDC's North Port location from GDC by contract dated February 27, 1974. (Am.Compl. at ¶ 16.) Plaintiffs Dr. William and Roseanne Tenerelli are also residents of the State of New Jersey, and purchased a total of 12 lots and a house in various GDC developments from GDC and GDV between the years 1972 and 1978. (*Id.* at ¶ 17.) All prospective class action plaintiffs are members of the Association, and all have purchased one or more lots and/or one or more houses in one or more GDC developments. (*Id.* at ¶ 15.)

### B. *THE DEFENDANTS*

There are 35 named defendants. Plaintiffs divide defendants into several groups "for purposes of description only, and in order to more easily understand the events" as set forth in their Amended Complaint. (Am. Compl. at p. 7.) Some defendants are listed in more than one group because, as plaintiffs claim, "various defendants have played multiple roles in the conspiracy." *Id.; see also id.* at ¶¶ 18–69.

The Amended Complaint classifies defendants in the following groups:[2]

City Defendants:
City Investing Company Liquidating Trust ("City Trust")
AmBase Corporation ("AmBase")
The Home Insurance Company ("Home")
Carteret Bancorp, Inc. ("Carteret Bancorp")} referred to collectively as "Carteret"
Carteret Savings Bank, FA ("CSB")[3]}
George Scharffenberger ("Scharffenberger")
Marshall Manley ("Manley")
Edwin Hatch ("Hatch")
Eben Pyne ("Pyne")

Inside Director Defendants:
Scharffenberger
Manley
Hatch
Pyne

2. For uniformity's sake, I shall refer to defendants in these same groups throughout this opinion. Out of fairness to defendants, however, I have renamed these groups as follows:

| Amended Complaint | Opinion |
| --- | --- |
| Control Conspirators | City Defendants |
| Controlling Interlocking Directors | Inside Director Defendants |
| GDC Director Conspirators | Director Defendants |
| Financing Conspirators | Financing Defendants |
| Mortgagee Conspirators | Mortgagee Defendants |
| Lot Contract Conspirators | Lot Contract Defendants |

3. CSB is currently under the receivership of the Resolution Trust Corporation (the "RTC") which, pursuant to an order of this court, shall answer or otherwise move to dismiss the Amended Complaint following the disposition of the pending motions.

Director Defendants:
David F. Brown ("Brown")
Robert F. Ehrling ("Ehrling")
Reubin O'D. Askew ("Askew")
Howard J. Clark, Jr. ("Clark")
Charles J. Simons ("Simons")
Peter R. Brinckerhoff ("Brinckerhoff")
Scharffenberger
Manley
Hatch
Pyne
Financing Defendants:
Southeast Bank, NA ("S.E. Bank")[4]
PaineWebber, Inc. ("PaineWebber")
Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch")
Prudential Insurance Company of America ("Prudential")
National Bank of Canada ("NBC")
Citicorp Real Estate, Inc. ("Citicorp")
First National Bank of Boston ("Boston")
Mortgagee Defendants:
Federal National Mortgage Association ("Fannie Mae")
Federal Home Loan Mortgage Corporation ("Freddie Mac")
Chase Federal Bank, FSB ("Chase")
Citizens and Southern Trust Company (Florida), N.A. ("C & S Trust")
Secor Bank, FSB ("Secor")
S.E. Bank
Home
Carteret
Prudential
Lot Contract Defendants:
Oxford First Corp. and Oxford Finance Companies, Inc.
(collectively "Oxford")
Greyhound Financial Corporation ("Greyhound")
StanChart Business Credit, Inc. ("StanChart")
Lloyds Bank, PLC ("Lloyds")
Harbor Federal Savings and Loan Association ("Harbor")
Merrill Lynch
NBC
Citicorp
Boston
John Doe Defendants:
Defendants 1–10 are persons and/or companies unknown to plaintiffs but who are believed to have joined or aided and abetted the conspiracy alleged in the Amended Complaint. Plaintiffs do not include defendants Cravath Swaine & Moore ("Cravath") or David G. Ormsby ("Ormsby") in any of these group classifications.

### V. FACTUAL HISTORY

The following is an overview of the facts as presented in the Amended Complaint, and is not intended to be comprehensive. Specific facts pertinent to allegations against particular defendants or groups of defendants will be set forth in the appropriate portion of the Discussion section below.

#### A. *THE GDC SCHEME*

According to plaintiffs, in or about 1957 GDC, together with "others," formulated a plan and scheme to defraud lot and house purchasers. (Am.Compl. at ¶ 70.)

In or about 1977 City Investing Company ("City") adopted a corporate plan to purchase, subdivide, market and finance the sale of raw acreage in Florida. Pursuant to such plan City acquired an ownership interest in GDC and at all times thereafter GDC was under the control of City and the City Defen-

---

4. S.E. Bank is currently under the receivership of the Federal Deposit Insurance Corporation (the "FDIC") which, as the real party in interest in this case, has submitted a motion to dismiss the Amended Complaint. To avoid confusion herein, however, I will continue to refer to the party as "S.E. Bank."

dants. (Am.Compl. at ¶ 5.)[5] Thus, all allegations against GDC and GDV, its wholly owned mortgage subsidiary, are asserted against the City Defendants.

GDC purchased large tracts of raw, undeveloped, almost worthless rural land totalling more than 1,000 square miles at various locations in Florida,[6] (*id.* at ¶ 73.), platted and subdivided the tracts, and made extensive improvements to only a small core of the tract to produce a "model area." (*Id.* at ¶ 72.) These model areas were used to persuade prospective purchasers that GDC had an existing intent to develop the rest of the tract similarly. (*Id.* at ¶ 74.) Moreover, GDC even provided skeletal improvements such as cutting canals and roads outside the model areas to portray the picture of a planned development and burgeoning community. (*Id.* at ¶¶ 72(a), 74.)

Plaintiffs allege that the City Defendants and GDC had no present intent to develop the tracts beyond the "model area" because GDC typically had not acquired the requisite building and municipal permits, (*id.* at 76), and because GDC was operating at a loss due to the construction and maintenance costs of the "model areas." (*Id.* at 75.)

In exchange for the lot, each purchaser executed a contract/non-recourse note pursuant to which he or she was required to make monthly payments. (*Id.* at ¶ 109.) Plaintiffs allege that these contract/notes were securities within the meaning of the 1934 Act. (*Id.*) GDC would then package its homesite contract receivables into pools that it could sell to others, and obligated itself to replace defaulted contracts with performing contracts. (*Id.* at ¶ 111.) GDC and the Lot Contract Defendants did not acquire the contracts/notes in a normal commercial transaction whereby the income would be derived from the interest payments. (*Id.* at ¶ 113.)

Instead, the recycling of lots as described below was relied on to generate a profit. (*Id.*) Similarly, plaintiffs claim that mortgages issued by house purchasers were also securities within the meaning of the 1934 Act. (*Id.* at ¶ 139.)

### 1. Targeting Prospective Lot Purchasers

GDC identified prospective purchasers nationwide and in foreign countries, (*id.* at ¶ 72(b)), by telephone, mailings and media advertising. (*Id.* at ¶ 81.) According to plaintiffs, GDC mostly preyed upon individuals who would be particularly vulnerable to its scheme, including those who spoke English only as a second language.[7] (*Id.* at ¶ 80.) To persuade these individuals to buy, GDC resorted to high-pressure sales tactics and false sales presentations. (*Id.* at ¶ 72(c).) Prospective purchasers were invited to attend local standardized sales presentations which were frequently labeled "investment seminars." (*Id.* at ¶ 82.) These presentations were usually held in hotel ballrooms where the prospective purchasers were treated to meals, liquor and prizes. (*Id.*) Seating was carefully arranged so that prospective purchasers were always accompanied by a GDC salesperson. (*Id.* at ¶ 83) GDC provided its salespeople with sophisticated sales training, (*id.* at ¶ 86), which even specified a salesperson's body movements. (*Id.* at ¶ 87.)

According to plaintiffs, GDC salespeople represented (a) that the "model area" exemplified the quality of the plans for development of the entire tract; (b) that GDC lots and houses enjoyed a steady and continuous price appreciation; (c) that lots could be bought now and developed later; (d) that the

---

5. In 1985, Fannie Mae discovered that GDC was using non-conforming appraisal methods to value properties, and refused to purchase any additional GDV mortgages. City, in an attempt to disassociate itself from GDC, transformed itself into a liquidating trust—City Trust. City Trust, however, continued to control the business and operations of GDC through a series of interlocking directors. (Am.Compl. at ¶ 5.)

6. These various sites in Florida included Port Charlotte, North Port, Port St. Lucie, Port Malabar (Palm Bay), Port LaBelle, Silver Springs

Shores, Port St. John, Julington Creek, Myakka Estates, Sebastian Highlands, and Vero Shores/ Vero Beach Highlands. (Am.Compl. at ¶ 73.)

7. Plaintiffs allege that many of the prospective purchasers fell primarily into some or all of the following categories: (a) out-of-State residents; (b) recent immigrants; (c) foreign nationals; (d) U.S. military personnel stationed overseas; (e) members of the lower to middle-income levels; (f) persons with limited educational background; and (g) persons unacquainted with Florida real estate values. (*Id.* at ¶ 80.)

purchaser could buy a lot with no personal liability and with no credit approvals; (e) that there was a significant resale market for GDC lots and houses; and (f) that the purchase of GDC lots or houses was an excellent investment. (*Id.* at ¶ 85.) Additionally, plaintiffs allege that GDC sales representatives concealed a whole host of facts, such as (a) GDC lot sales prices were entirely artificial and arbitrary and devoid of any relationship to their fair market value; (b) the lots could only be resold in the open market at a material discount of up to 80% of GDC's artificially assigned price; (c) over 50% of lot purchasers never completed their payments and defaulted within the first two years, enabling GDC to cancel their contracts, retain all payments to date and to resell those lots time after time; (d) GDC did not intend to fully develop lots or the community outside the "model area" because of insufficient resources and/or the lack of necessary permits; (e) GDC had a consistent record of materially underestimating the lot improvement costs; and (f) the cost to improve a lot exceeded the lot's sales price. (*Id.* at ¶ 87.)

Most importantly, the prospective purchasers were unaware that each time the value of the lots and houses was referred to by GDC, the amount being quoted was really GDC's arbitrarily assigned sales price and not the fair market value of the property. Beginning in 1985, and in order to give the impression that the "appreciation" was based on fair market value, GDC inflated and regularly increased the amount it collected from lot owners supposedly as property tax assessments when in fact the property taxes had not increased. (*Id.* at ¶ 161.) For example, GDC would collect $275 per year in "taxes" when the actual allotted tax was only $16. (*Id.* at ¶ 162.) If an owner defaulted, GDC simply kept all the "tax" money that had been paid.

### 2. *House Sales Schemes*

Similar techniques were employed for house sales. GDC targeted almost exclusively lot owners in its efforts to sell houses. (*Id.* at ¶ 116.) When GDC believed that a lot owner was financially qualified to buy a GDC house, (*id.* at ¶ 121), GDC frequently sponsored promotional trips to Florida. (*Id.* at

¶ 119.) These trips were planned by GDC because it knew that most lot owners did not live in Florida and were not familiar with the area's housing market. (*Id.* at ¶ 116.) While the prospective house purchasers were on these promotional trips, GDC carefully monitored their activities to prevent them from becoming aware of the true market value of houses in the contiguous geographic regions, even though GDC promoted these trips as an opportunity for a prospective purchaser to make an informed decision. (*Id.* at ¶ 122, 123.) GDC employed a group of hotels which would screen incoming telephone calls to these prospective house purchasers (to prevent independent realtors from speaking with the prospective purchasers), and would remove all newspapers and non-GDC advertising materials from the hotel. (*Id.* at ¶ 123.) GDC did not want it revealed that a comparable house in Florida was selling 50% to 75% below GDC's selling price. (*Id.* at ¶ 126.)

GDC promoted a "One–Stop Shopping" program, whereby GDV would provide the mortgage, Florida Home Finders, Inc. ("FHF") (GDC's rental agent subsidiary) would provide rental services and Community Title Agency ("CTA") (a wholly owned subsidiary of GDC) would conduct all closings and title conveyances, eliminating the purchaser's need to have his or her own attorney at the closing. (*Id.* at ¶¶ 123, 125, 127.) Prospective house purchasers were advised that if they did not obtain their mortgage from GDV, they would have to pay in cash. (*Id.* at ¶ 127(b).) If a prospective house purchaser attempted to secure independent financing, GDC denied independent appraisers access to the property, thus making independent mortgage financing almost impossible. (*Id.* at ¶ 127(d).)

To "assist" prospective purchasers in obtaining mortgages, GDC prepared, executed and instructed house purchasers to execute a "vendor/purchaser" affidavit as required by Fannie Mae and Freddie Mac. (*Id.* at ¶ 137.) The affidavit falsely represented that the loan to value ratio of the mortgage was 75%, that the cash sum described in the purchase agreement as having been made by the purchaser was actually made, that the cash credit allowed for the purchaser's equity and that

"appreciation" in the lot was "cash equivalent." (*Id.*) Plaintiffs allege that GDC concealed the following facts: its houses were substantially more expensive than comparable houses in the surrounding area; rental incomes were less than had been represented; no refinancing on similar terms was available from any independent mortgagees; the costs for mortgages available through GDV were higher than those available at other lending institutions; and appraisal methods which conflicted with generally accepted appraisal standards in the real estate industry were used by GDC to show falsely that the sales price equalled fair market value. (*Id.* at ¶ 138.)

GDC also formulated other plans to further its efforts to sell houses. For example, GDC sponsored a "lot exchange" program which permitted a current GDC lot owner (who had not yet paid the full balance due on the lot) to acquire a new lot and house (a "package") by giving him or her credit for both the money already paid toward the old lot and for a portion or all of any purported "appreciation" in the price of the old lot, as measured by GDC's inflated sales price. (*Id.* at ¶ 133.) The leftover balance on the package's price was to be paid by cash and a GDV mortgage. (*Id.*) The old lot was then placed into GDC's inventory and resold. (*Id.*) Similarly, a "lot swap" program was available whereby GDC re-acquired the old lot when the balance had already been paid in full. (*Id.* at ¶ 134.) Like the "lot exchange" program, the purchaser got a credit equal to a portion or all of the original GDC sales price plus some part of the "appreciation" towards the purchase price of a package. (*Id.* at ¶ 134.) Again, the remainder of the balance was paid by cash and a GDV mortgage, and the old lot returned to GDC inventory for resale. (*Id.*)

### 3. *Purchaser Defaults and GDC Recycling of Lots*

Since most of the lots were purchased primarily as investments, and most of the purchasers lacked the money to visit their lots, GDC anticipated that most of the prospective purchasers would never discover the fraud, that most of the loans would end in default, that GDC could then recycle the lot for resale at a higher price to another purchaser, and that this repeated recycling of lots would postpone the need to commence the improvement and development of the "communities" indefinitely. (*Id.* at ¶¶ 92–93, 95.)

Lots were sold with 10½– to 12½–year payment schedules. (*Id.* at ¶ 88.) GDC typically retained title and possession of a lot unless the entire purchase price was paid or separate arrangements were made with the parties financing the lot contract receivables. (*Id.*) The average lot contract down payment was 8.4% and the balance bore interest at 4.9% to 9%, depending on the amount of the down payment. (*Id.*)

To convince lot owners that their lots were increasing in value, GDC regularly announced publicly and via letters, brochures and appraisal cards, and at periodic status meetings, that lot prices had appreciated. (*Id.* at ¶¶ 100–101, 103.) For example, GDC suggested that a lot could be expected to lead to a 250% return on investment and that a purchase of a GDC lot was "an investment in an inflation proof growth." (*Id.* at ¶ 104.) What GDC failed to reveal is that the quoted amounts were merely GDC's sales prices which were arbitrarily set and not reflective of the fair market value, and that 50% of the purchasers defaulted on their payments within the first two years. (*Id.* at ¶ 102.)

These practices led to an investigation of GDC by the Federal Trade Commission (the "FTC") in the early 1980's, which culminated in a 1982 consent decree (the "FTC Consent Decree") in which GDC agreed to refrain from such practices. Pursuant to the FTC Consent Decree, GDC included disclaimer language in various written documents to lot purchasers—language which plaintiffs allege to be false. (*Id.* at 107.) According to plaintiffs, the disclaimer language was substantially as follows:

> The future value of land is very uncertain and dependent upon many factors. Do not expect all land to increase in value.
>
> \* \* \* \* \* \*
>
> Resale of your lot may be difficult or impossible, since you may face the competition of our own sales program and local

real estate brokers may not be interested in listing your lot.

\* \* \* \* \* \*

HOMESITES ARE BEING OFFERED BY GENERAL DEVELOPMENT FOR FUTURE USE IN BUILDING A HOME AND NOT AS A BUSINESS INVESTMENT. PROFIT ON A RESALE CANNOT BE GUARANTEED AND SHOULD NOT BE ASSUMED.

\* \* \* \* \* \*

Homesite prices are based on the cost of doing business, the fact that the offering is for extended terms over a period of years, and other factors. Such prices may not necessarily reflect the level of market prices of similar property sold by others on different terms.

\* \* \* \* \* \*

THE PURCHASER SHOULD ASCERTAIN FOR HIMSELF THAT THE PROPERTY OFFERED MEETS HIS PERSONAL REQUIREMENTS AND EXPECTATIONS. MISUNDERSTANDINGS AS TO THE DESIRABILITY OF THE PROPERTY MAY ARISE WHEN THE PURCHASER FAILS TO UNDERSTAND THE NATURE OF THE PROPERTY OFFERED OR THE TERMS OF THE CONTRACT.

\* \* \* \* \* \*

*DO NOT SIGN UNLESS YOU HAVE READ THE OFFERING STATEMENT*

\* \* \* \* \* \*

(Am.Compl. at ¶ 106) (citing GDC Florida Public Offering Statement (North Port) Rev. Nov. 21, 1986, at pp. 3, 8–9 (emphasis in original)). Plaintiffs contend that this disclaimer language is false primarily because GDC knew that the market and resale prices of GDC lots were materially lower than GDC sales prices and that the GDC sales prices were artificial and arbitrary. (*Id.* at ¶ 107.)

GDC cancelled lot contracts which were in default for six months and retained the amount paid towards the purchase of the lot. (*Id.* at ¶ 89.) GDC expected to make money from defaults by lot purchasers by keeping the lots as well as all monies (including surplus "tax" charges) paid to date less commissions paid [8] prior to the default, and ultimately reselling the lots to new purchasers at higher prices. (*Id.* at ¶ 95.) By not requiring the purchasers to be personally obligated on their GDV mortgage loan, GDC gambled that purchasers would discontinue their payments once they realized that the value of the lot was decreasing or worth less than they had paid. (*Id.* at ¶ 98.) When there were tens of thousands of lots offered for resale by defrauded lot purchasers, GDC entered into agreements appointing various undisclosed agents to repurchase the lots at an average of $2,500 each, plus commissions for the agents. (*Id.* at ¶ 114.) After acquiring the repurchased lots, GDC placed them into their inventory and resold the lots overseas to purchasers in Taiwan and Korea for $20,000 each. (*Id.*) By recycling the lots in this manner, GDC postponed incurring improvement expenses. (*Id.* at ¶¶ 95, 114.)

When potential plaintiffs attempted to organize to become more informed, GDC and its agents engaged in practices specifically designed to keep them from ascertaining the truth. (*Id.* at ¶ 158.) GDC directed lot and house owners' complaints to its Housing Customer Service Office ("HCS"). HCS had a standardized response procedure to deal with complaints. (*Id.* at ¶ 146.) When owners complained that other comparable GDC houses were being offered at higher prices or that non-GDC houses were being sold for less than GDC sales prices, HCS told them that the GDC prices were higher because a greater range of services had been provided. (*Id.* at ¶ 148.) HCS explained that any decline in value was due to a slump in the real estate market. (*Id.* at ¶ 147.) If house or lot purchasers were dissatisfied with these explanations, HCS offered them a small cash settlement with the understanding that the

---

8. Commissions on lot sales ranged from 10% to 30% of the sales price, (*id.* at ¶ 90), materially higher than customary real estate commissions. (*Id.* at ¶ 87(k)). With commissions typically exceeding 21% and the purchaser's down payment, GDC usually did not retain any of the purchaser's payment money for at least one year. (*Id.* at ¶ 90.) Moreover, GDC charged purchasers interest rates substantially below the interest rate GDC was required to pay on its borrowed money for financing its operations. (*Id.* at ¶ 113.) As a result, each time GDC sold a lot, GDC systematically increased its negative cash flow. (*Id.* at ¶¶ 90, 113.)

complaint and settlement would remain confidential.[9] (*Id.* at ¶ 149.) If the purchaser persisted, then HCS simply increased the settlement amount. (*Id.*)

## B. THE ALLEGED PARTICIPANTS IN THE SCHEME

### 1. The City Defendants

According to plaintiffs, Scharffenberger, City Investing Company ("City") and City Trust, through the Inside Director Defendants, controlled the operations of the City Defendants in aid of extracting from GDC the proceeds obtained from the defrauded lot and house purchasers. This occurred after Fannie Mae discovered the fraud in 1985 and refused to purchase any additional GDV mortgages. This led to City's attempt to disassociate itself from GDC by transferring itself into the liquidating trust—City Trust. (*Id.* at ¶ 241.) From 1977 to 1981, City was a majority shareholder of GDC, and treated Home's 21% holding of GDC as its own. (*Id.* at ¶ 242.) From 1981 to 1985 City was the sole owner of GDC. (*Id.*) From its inception in 1985 to June 1986, City Trust was the record holder of 38% of the shares of GDC when it distributed those shares to holders of beneficial interests in City Trust, including Scharffenberger. (*Id.*) From 1977 to 1985 City was the sole owner of AmBase (then named The Home Group, Inc.), which in turn was the sole owner of Home. (*Id.* at ¶ 243.) From 1988 to the present, AmBase has been the sole owner of Carteret Bancorp, which is the sole owner of CSB.[10] (*Id.*) As GDC, AmBase, Home and Carteret were acquired within the City network, they became part of one entity controlled by the Inside Director Defendants under the control of Scharffenberger. (*Id.* at ¶ 244.)

Plaintiffs allege that the Inside Director Defendants dominated the City Defendants because of their positions during the time period relevant to the present action. (*Id.* at ¶ 245.) Specifically, they, along with the Director Defendants, constituted a majority on the Board of Directors of GDC from 1985 to 1990. (*Id.* at ¶ 249.) The following charts illustrate the positions held by the Inside Director Defendants and Director Defendants Brown and Ehrling in the various City-related companies:

### Scharffenberger

| Company | Position | Term |
|---|---|---|
| City Trust | Trustee | 1985—present |
| City | CEO | 1966—5/85 |
| | Chairman of the Board | 1974—9/85 |
| AmBase | President & CEO | 3/90—present |
| | Director | 1975—present |
| | Chairman of the Board | 1984—present |
| Home | Director | 1969—1991 |
| GDC | Director | 1977—3/90 |
| | Chairman of the Board | 1977—9/85 |
| | Member of Personnel Committee | 9/85—3/90 |

9. As an additional example of both GDC's improper conduct and its desire to keep dissatisfied lot and house owners mum, plaintiffs claim that around 1983, GDC entered into an agreement with the producers of "Dream House," a nationally syndicated television game show, to feature a GDC lot and house as a "grand prize." (Am. Compl. at ¶ 152.) GDC represented to the producers that the lot and house had a "fair market value" of between $85,000 and $100,000. When a couple from California won the house, GDC arranged for GDV to give them a $20,000 loan to pay the income taxes so that the couple could avoid having to go to an outside lender for the loan or having to sell the house to raise money for the taxes. (*Id.* at ¶¶ 153–54.) When the couple later discovered that the fair market value was only $40,000, GDC quickly agreed to a secret settlement of $90,000 in order to prevent unfavorable media exposure. (*Id.* at ¶ 154.)

10. *See* note 3, *supra.*

## Manley

| Company | Position | Term |
|---|---|---|
| City | President & Director | 3/85—9/85 |
| | CEO | 5/85—9/85 |
| AmBase | President | 3/85—3/90 |
| | Chief Operating Officer | 9/85—12/86 |
| | CEO | 12/86—3/90 |
| | Director | 1985—present |
| Home | Director & Chairman of Board | 1985—1991 |
| GDC | Director & Chairman of Personnel Committee | 1985—1990 |

## Hatch

| Company | Position | Term |
|---|---|---|
| City | Director | 1968—9/85 |
| AmBase | Director | 1980—1991 |
| Home | Director | 1962—1991 |
| GDC | Director, Chairman of Audit Committee, Member of Finance and Personnel Committees | 9/85—3/90 |

## Pyne

| Company | Position | Term |
|---|---|---|
| City Trust | Trustee | 1985—present |
| City | Director | 1964—9/85 |
| AmBase | Director | 1975—present |
| Home | Director | 1978—1991 |
| GDC | Director, Member of Personnel Committee | 9/85—3/90 |

---

(*Id.* at ¶ 245.)

The City Defendants appointed Brown and Ehrling to supervise the day-to-day operations of GDC, and they held various positions there, as follows:

## Brown

| Company | Position | Term |
|---|---|---|
| City | V.P. and General Counsel | 1972—1985 |
| GDC | V.P. and General Counsel | 1977—1985 |
| | Director & Chairman of the Board | 1985—1990 |

## Ehrling

| Company | Position | Term |
|---|---|---|
| GDC | President | 1980—1990 |
| | Director | 1983—1990 |

(*Id.* at ¶ 246.)

Scharffenberger and his agents and nominees controlled the GDC board of directors from 1977 until the criminal indictment in 1990, while Manley served as his personal attorney. (*Id.* at ¶ 247–48.) The Inside Director Defendants, Brown, Ehrling and later the other Director Defendants used GDC, GDV, AmBase, Home and Carteret to further the scheme. (*Id.* at ¶ 251.) For example, in or about 1973, they required Home to act as sales agent for GDC, and to offer GDC lots for sale to Home's employees. (*Id.*) The Inside Director Defendants, the Director Defendants, City and City Trust forced GDC and GDV to do business with Carteret and Home without competitive bidding and required them to grant preferred terms on various business matters. (*Id.* at ¶ 252.)

According to plaintiffs, City controlled GDC, GDV, AmBase, Home and Carteret within the meaning of the 1934 Act. (*Id.* at ¶ 253.) Because City Trust owned an interest in GDC, was the successor in interest to City and was directed by the Inside Director Defendants, City Trust also controlled the same companies within the meaning of the 1934 Act. (*Id.* at ¶¶ 254–55.) Plaintiffs allege that City and then City Trust controlled these companies under the principles of *respondeat superior.* (*Id.* at ¶ 256.) City operated as a holding company and its sole sources of revenue were dividends and payments it extracted from its subsidiaries under mandated tax sharing agreements. (*Id.* at ¶ 257.)

From 1980 through 1983, the City Defendants required GDC to change its policy of recognizing revenue from lot sales on an installment basis to recognizing revenue for the full sales price at the time of sale, even though the sales price was payable over a ten-year period. (*Id.* at ¶ 258.) The advantage of using the installment method is that income is recognized over the life of the ten year pay-out permitting income recognition to match with cash flow. (*Id.*) Therefore, recognizing revenue without cash receipts for the full sales price at the time of sale forced GDC to pay income taxes on revenues it had not yet collected. (*Id.* at ¶ 259.) City, however, benefited from this income method because it created fictitious profits and retained earnings on GDC's books, thereby allowing the City Defendants to continuously make upstream cash payments to City in the form of dividends. (*Id.*) Moreover, GDC's higher reported earnings and profits were reported on City's consolidated financial statements, thereby supporting City's stock prices. (*Id.*)

While City benefited from this accounting practice, GDC suffered. GDC lacked the cash to pay the taxes because, due to up-front sales expenses and commissions payments, GDC could not retain any monies earned from lot sales during at least the first year of payments. (*Id.*) In some instances when GDC did not have sufficient cash to pay the dividends to City, GDC had to borrow the money, which further aggravated its negative cash flow. (*Id.*) In 1985, City disclosed that under the tax sharing agreement, GDC was indebted to City in excess of $90 million. (*Id.* at ¶ 260.) This agreement provided that GDC was to pay City the amount of taxes GDC would have had to pay (at an effective rate of approximately 46%) if GDC had separately filed a federal income tax return—regardless of whether City ever had to pay that amount or at that rate. (*Id.* at ¶ 261.) Moreover, as GDC, City and the Inside Director Defendants knew, both GDC's and City's financial statements for the period 1980 to 1983 failed to disclose the change in treatment of GDC's income, and in fact stated that the installment method was still in use. (*Id.*)

As a member of the advisory board of Freddie Mac, Manley knew that GDC's and GDV's methodology was a departure from Fannie Mae and Freddie Mac market standards for purchasing of mortgages. (*Id.* at ¶ 265.) He knew that if Fannie Mae's and Freddie Mac's reasoning for refusing to pur-

chase GDC's and GDV's mortgages was disclosed, GDC would be closed off completely from the secondary mortgage market. (*Id.*) Lastly, he was aware that such mortgages could be sold thereafter only if GDC and/or GDV also provided side guarantees and credit enhancements. (*Id.*) The City Defendants, including the Inside Director Defendants, knew that if the fraud was exposed they, along with GDC and GDV, would be subject to huge claims without funds to pay them. (*Id.* at ¶ 266.) The City Defendants learned no later than early 1985 that Fannie Mae refused to purchase GDC/GDV mortgages, (*id.* at ¶ 262), and consequently decided to separate themselves from GDC. (*Id.* at ¶ 267.)

According to plaintiffs, the City Defendants, with the assistance of Cravath, conceived a plan to extract over $100 million from GDC and simultaneously appear to separate themselves from GDC, while still retaining control over GDC and ensuring concealment of their participation in the fraudulent scheme. (*Id.* at ¶ 268.) The City Defendants and Cravath arranged for City to sell 62% of GDC stock to the public and retain 38% in City Trust for later distribution. (*Id.*) Simultaneously, they required GDC to borrow in excess of $100 million and remit it to City as a dividend (the "City Dividend"). Not only was this a fraudulent conveyance, but it rendered GDC insolvent.[11] (*Id.* at ¶¶ 268, 273.) The City Defendants knew that in order to satisfy the increased debt caused by the payment of the City Dividend, lot and house sales would have to increase 62% and 31% respectively.[12] (*Id.* at ¶ 279.) In addition, the Inside Director Defendants, City and City Trust had the GDC Certificate of Incorporation amended so as to assure themselves that even with a minority ownership and representation in GDC, they would continue to control GDC. (*Id.* at ¶ 269.)

In order to create the semblance of sufficient capital concurrently with payment of the City Dividend, the City Defendants had City "contribute" to GDC's capital account the $90 million GDC "debt" due City under the tax sharing agreement in order to dress the GDC balance sheet to show strength after payment of the dividend. (*Id.* at ¶ 271.) Thus, City donated to GDC the cancellation of GDC's liability to City, which City itself had forced GDC to incur by the early recognition of revenue used to enable GDC to pay dividends to City in prior years. (*Id.*) City further required that GDC pay City, until City sold its holdings in GDC, monthly dividends in an amount up to 50% of GDC's after-tax net income. (*Id.* at ¶ 272.)

Plaintiffs allege that the City Defendants, GDC, the Director Defendants and Cravath knew that the City Dividend was a fraudulent conveyance and illegal, that the fair saleable market value of GDC's assets was less than the amount required to pay its existing debts and that the dividend caused GDC to

---

11. The City Dividend Prospectus confirms that the City Dividend caused GDC to become insolvent:

" '[T]he direct consequence of the transactions ... [will increase GDC debt] from approximately $201 million ... to approximately $320 million ... without a corresponding increase in GDC's cash. This increase in outstanding indebtedness will contribute to [GDC's] significant operating cash flow deficits which are estimated to aggregate $108 million from the beginning of 1985 through 1988....

\* \* \* \* \* \*

... [GDC] will experience an increase in interest expense and an attendant decrease in net cash flow as a result of the increase in outstanding indebtedness ...

\* \* \* \* \* \*

... In view of the substantially increased level of debt resulting primarily from the borrowing by [GDC] for the purpose of paying the dividend to City ... [GDC] anticipates that net cash flow from operations *will be insufficient to satisfy future principal and interest requirements.*' "

(*Id.* at ¶ 278, quoting City Dividend Prospectus at pp. 3–4, 9 (emphasis added in Am.Compl.).)

12. Indeed, the City Dividend Prospectus warned that,

" 'In order to satisfy the substantially increased levels of interest on its additional debt, [GDC] expect[ed] to increase borrowings, accelerate planned sales of commercial properties, sell additional equity securities (with a consequent risk of dilution to purchaser of the Units) or sell other selected assets, or to take some combination of the foregoing actions.' "

(*Id.* at ¶ 279) (quoting City Dividend Prospectus at 9.)

have further debts it could not pay. (*Id.* at ¶ 281.) Moreover, plaintiffs claim that the dividend was paid without fair consideration and with little to no stated capital. (*Id.*)

According to plaintiffs, the City Defendants, GDC, the Director Defendants and Cravath knew the City Dividend Prospectus contained misrepresentations. (*Id.* at ¶ 283.) The Prospectus claimed that Fannie Mae's decision to cease purchasing GDC mortgages was due to a periodic change of purchase criteria—rather than admitting that the GDC's non-conforming appraisal methods never met Fannie Mae's standard. (*Id.* at ¶ 284(a).) The Prospectus failed to disclose that since it had not changed its non-conforming appraisal method, the company was forced to sell its mortgages only through fraudulent practices or be excluded from the secondary mortgage market altogether. (*Id.* at ¶ 284(b).)

Similarly, the prospectus did not reveal the deceptive practices GDC used to lure prospective purchasers to buy lots and houses and to entice owners to "upgrade" to another lot or house, that 50% of purchasers defaulted within 2 years or that their lots were recycled. (*Id.* at ¶ 284(c).) Plaintiffs allege that the Inside Director Defendants, with the assistance of Cravath and Ormsby, caused GDC's subsequent financial statements to be issued with materially false and misleading statements. (*Id.* at ¶¶ 285, 295.) GDC's 1985, 1986 and 1987 Form 10–Ks failed to provide the information that also had been previously concealed in the City Dividend Prospectus. (*Id.* at ¶¶ 286–93.)

According to plaintiffs, each of the City Defendants materially aided GDC's fraud by allowing GDC to use its name in connection with sales presentations and documentations, thereby enhancing GDC's reputation in the public eye. (*Id.* at ¶ 294.) When City sold GDC, City and the Inside Director Defendants earned almost $200 million—$100 million from the sale of 62% of GDC to the public (netting City $62 million and allowing City to place a value of $38 million on the GDC stock it retained for further distribution in 1986), plus $100 million from the City Dividend. (*Id.* at ¶ 296A.) At the same time, the Inside Director Defendants retained control of the GDC board pursuant to the Amended Certificate of Incorporation. According to plaintiffs, they continued to control and conceal the fraudulent scheme until GDC's indictment in April 1990. (*Id.*)

### 2. *The Inside Director Defendants and Director Defendants*

The Inside Director Defendants are also categorized by plaintiffs as City Defendants and Director Defendants. According to plaintiffs, each of the Inside Director Defendants is a "controlling person" within the meaning of the 1934 Act because of his position as an officer and/or director. (*Id.* at ¶ 319; *see generally* chart of inside directors and their positions, *supra* pp. 23–24.) Each of the Director Defendants is also a "controlling person" of GDC within the meaning of the 1934 Act for the period from September 1985 to March 1990, (*id.* at ¶ 320), and each gained additional knowledge by serving as members on various GDC committees. (*Id.* at ¶ 331.)

The Audit Committee included Hatch (Chairman), Askew, Clark and Simons, and its principal function was to advise the Board on internal and external audit matters including the recommending of appointments of independent auditors. (*Id.* at ¶ 331(a).) The committee also reviewed with these auditors the financial statements, investigations and surveys prepared by the auditors, and it reviewed reports of GDC's Internal Audit Department. (*Id.*) The Finance Committee included Simons (Chairman), Brown, Brinckerhoff, Clark, Ehrling and Hatch. The Finance Committee's principal purpose was to convene when it was impossible or inconvenient for the Board to meet. (*Id.* at ¶ 331(b).) Under Delaware law, this committee was authorized to declare dividends and to authorize the issuance of stock. (*Id.*) The Personnel Committee included Manley (Chairman), Clark, Hatch, Pyne, Scharffenberger and Simons. (*Id.* at ¶ 331(c).) The Personnel Committee reviewed GDC's management resources, the executive officer selection, and development processes, as well as the salary and bonus levels for all the executive officers

of GDC and its subsidiaries. (*Id.*) It also administered employee benefits and compensation plans. (*Id.*)

As senior operating and executive officers of GDC, Brown and Ehrling had day-to-day responsibility for supervising the operations of GDC and its subsidiaries. (*Id.* at ¶ 322.) Plaintiffs allege that Brown and Ehrling took specific actions to further the GDC scheme which included (a) meeting with GDC's and GDV's appraisers to reassure them of the viability of GDC's appraisal practices, (b) approving settlements with lot and house purchasers in order to fend off adverse publicity, (c) directing GDC salespersons to engage in fraudulent sales practices and (d) directing attempts to hide the scheme. (*Id.*)

### 3. *The Financing Defendants*

#### S.E. Bank

S.E. Bank, a federally chartered banking association with its principal place of business in Florida, (*id.* at ¶ 41), is also categorized by plaintiffs as a Mortgagee Defendant. Director Defendant Simons served as a director of both S.E. Bank and GDC at relevant times, and acquired or had a duty to acquire knowledge and understanding of GDC's business, operations and plans, including knowledge of the GDC lot and house sales scheme. (*Id.* at ¶ 336.) According to plaintiffs, Simons' knowledge of the GDC scheme is imputable to S.E. Bank as a matter of law. (*Id.*)

Under an agreement with GDC and/or GDV, S.E. Bank "warehoused" newly originated GDV mortgages for up to 120 days prior to the pooling and sale of the mortgages. (*Id.* at ¶ 337.) This bridge financing was essential to GDC's financial stability, as was known by S.E. Bank, because GDC and GDV could not afford to carry construction costs while holding these mortgages until they were pooled and sold. (*Id.* at ¶ 338.) Plaintiffs contend that S.E. Bank also knew that these GDV mortgages exceeded the actual value of the houses themselves, that they were based on non-conforming appraisals, and that they could not be resold in the secondary mortgage market. (*Id.* at ¶ 339.)

Additionally, in or about March 1988, S.E. Bank, acting as Trustee, issued $10,000,000 in *Variable Rate Mortgage–Backed Pass–Through Certificates, Series 1988–1,* (the "1988 S.E. Bank Certificates"), which were supported by the GDV mortgages and sold in a private placement. (*Id.*) As of November 30, 1990, these mortgages had an approximate aggregate principal balance of $8,800,-000. (*Id.*) Plaintiffs claim that S.E. Bank should have been alerted to the GDC house sales fraud when due diligence was performed during the private placement process, (*id.* at ¶ 216), and that S.E. Bank's failure to require the full and accurate disclosure of material facts constituted a knowing concealment of and active participation in the scheme. (*Id.*)

#### PaineWebber

PaineWebber is a Delaware corporation, and is engaged in the investment banking business. (*Id.* at ¶ 42.) Director Defendant Brinckerhoff served as a managing director of PaineWebber and Merrill Lynch and as a director of GDC at relevant times, and acquired or had a duty to acquire knowledge and understanding of GDC's business, operations and plans, including knowledge of the GDC lot and house sales scheme. (*Id.* at ¶ 348.) According to plaintiffs, Brinckerhoff's knowledge of the GDC scheme is imputable to PaineWebber as a matter of law. (*Id.*)

PaineWebber was the co-lead underwriter for the issuance of $125,000,000 of 12⅞% senior subordinated notes by GDC in a public offering (the "1988 PW/ML $125 Million Financing") and was also the underwriter for the *Adjustable Rate General Development Residential Mortgage Pass–Through Certificates, Series 1989–A* (the "1989 C & S/PW Public Issue Certificates"), and performed extensive due diligence investigations in connection therewith. (*Id.* at ¶¶ 42, 346). Plaintiffs allege that in its due diligence investigations, PaineWebber acquired actual knowledge as to GDC's lot and house sales scheme, and if it did not do so, such failure was a result of a reckless disregard for the truth. (*Id.* at ¶ 347.) Additionally, because Paine-

Webber and Merrill Lynch shared due diligence responsibilities in connection with the 1988 PW/ML $125 Million Financing, any knowledge acquired by Merrill Lynch regarding the GDC fraud would be imputed to PaineWebber as well, and *vice versa*. (*Id.*) Plaintiffs further allege that as co-underwriter and co-issuer of the Prospectus for the 1988 PW/ML $125 Million Financing, and underwriter and issuer of the Prospectus for the 1989 C & S/PW Public Issue Certificates, PaineWebber had an obligation to completely and truthfully disclose the material facts included therein, that it knowingly omitted from disclosure material facts regarding the GDC scheme, (*id.* at ¶ 350), and that by failing to disclose matters within its knowledge, PaineWebber knowingly enabled GDC to acquire additional financial resources for perpetuation of the scheme and/or aided and abetted the fraud. (*Id.* at ¶ 351.)

### Merrill Lynch

Merrill Lynch is a Delaware Corporation, is engaged in the investment banking business, (*id.* at ¶ 43), and is also categorized by plaintiffs as a Lot Contract Defendant.

Along with PaineWebber, Merrill Lynch was co-lead underwriter for the 1988 PW/ML $125 Million Financing through its Merrill Lynch Capital Markets Division. (*Id.*) Additionally, Merrill Lynch was the lead underwriter for the issuance of $175 million in 12⅝% subordinated debentures by GDC and ancillary transactions (the "1985 ML City Dividend Financing") used primarily to finance the City Dividend. (*Id.*) As underwriter in these financings, Merrill Lynch had an obligation to completely and truthfully disclose the material facts included therein; yet it knowingly omitted from disclosure material facts regarding the GDC scheme, (*id.* at ¶ 355), and by failing to disclose matters within its knowledge, Merrill Lynch knowingly enabled GDC to acquire additional financial resources for perpetuation of the scheme and/or aided and abetted the fraud. (*Id.* at ¶ 356.)

### Prudential

Prudential is a mutual insurance company incorporated in the State of New Jersey, (*id.* at ¶ 44), and is also categorized by plaintiffs as a Mortgagee Defendant.

In 1972, Prudential and GDC entered into an agreement by which Prudential lent GDC $30,000,000 subject to certain conditions, including the retaining of control over the manner in which GDV conducted its mortgage operations and its permanent placement of mortgages with third parties (the "1972 Prudential Control Agreement"). (*Id.* at ¶ 44.) Additionally, in or about January 1988, Prudential invested $100 million in GDC pursuant to a note and stock purchase agreement whereby it lent $75,000,000 to GDC and received in return $75,000,000 of 12.75% debentures with warrants to purchase 500,000 shares of GDC common stock at $25 per share (the "1988 Prudential $100 Million Financing"). (*Id.*) Prudential also purchased $25,000,000 of GDC preferred stock, likewise convertible into GDC common stock, and purchased and/or financed GDV-originated mortgages on houses purchased by plaintiffs and others. (*Id.*)

Plaintiffs allege that Prudential had actual knowledge of the GDC scheme *no later than* 1987, (*id.* at ¶ 358), and that it nonetheless proceeded with the 1988 Prudential $100 Million Financing, thus assisting GDC in the execution and perpetuation of the scheme. (*Id.* at ¶ 360.)

### NBC

NBC is a Canadian banking corporation doing business in New York, (*id.* at ¶ 45), and is also categorized by plaintiffs as a Lot Contract Defendant. NBC issued letters of credit on behalf of GDC and/or GDV, and, as alleged by plaintiffs, for the benefit of Mortgagee Defendants, including Carteret and S.E. Bank. (*Id.* at ¶ 364.) These letters of credit, provided as additional security for the sale of mortgage pools, allegedly enabled GDV to continue its packaging and sale of mortgages. (*Id.*)

### Citicorp

Citicorp is a New York corporation, (*id.* at ¶ 46), and is also categorized by plaintiffs as a Lot Contract Defendant. Citicorp participated in the issuance of an extension of

credit to GDC and GDV by a consortium of banks (the "1985 Revolving Credit Agreement"), which included the extension of a sinking credit fund to GDC which enabled it to continue its operations. (*Id.* at ¶ 365.)

### Boston

Boston is a federally chartered commercial bank, (*id.* at ¶ 47), and is also categorized by plaintiffs as a Lot Contract Defendant. Boston, along with defendant Citicorp, participated in the 1985 Revolving Credit Agreement. (*Id.* at ¶ 366.)

### 4. *The Mortgagee Defendants*

*Allegations as to all Mortgagee Defendants*

Since 1982 or earlier, GDV sold pools of mortgages on GDC houses to various lenders, including the Mortgagee Defendants. (*Id.* at ¶ 173.) First, GDV transferred the mortgages to S.E. Bank under a "warehousing" agreement whereby GDV could borrow up to $25,000,000 as "bridge financing" against the mortgages pledged as collateral; then, GDV had 120 days to permanently place the mortgage with a lender (including the Mortgagee Defendants) and pay off the bridge financing from the proceeds. (*Id.* at ¶ 174.) On a regular basis, mortgages held by S.E. Bank were packaged by GDV into "mortgage pools" for sale to various lenders (including the Mortgagee Defendants). (*Id.* at ¶ 175.) [13] This practice of pooling the mortgages gave GDV ready access to large lump sums of cash without it having to wait for the monthly mortgage payments to be made. (*Id.*)

The Mortgagee Defendants obtained additional protection on the mortgage pools by requiring GDC and/or GDV to: (i) repurchase mortgages in default or substitute therefor another mortgage not in default; (ii) guarantee to pay the monthly amounts due on non-performing mortgages, regardless of the amounts received and/or defenses raised (i.e. unconditionally); and (iii) establish letters of credit or deposit accounts for the benefit of the Mortgagee Defendants. (*Id.* at ¶ 184.) The Mortgagee Defendants made GDV their authorized agent and gave it a power of attorney to deal with the respective mortgagors. (*Id.* at ¶ 176.) GDV acted as the collecting and distributing agent for the Mortgagee Defendants and instituted foreclosure proceedings on their behalf. (*Id.*)

According to plaintiffs, the fact that Fannie Mae and Freddie Mac refused to accept GDV originated mortgages (which is evidenced in GDC's financial statements beginning in 1985) put the Mortgagee Defendants on notice that a fraud was being perpetrated by GDC and GDV. (*Id.* at ¶ 177.) In essence, the service the Mortgagee Defendants were providing was a secondary market for GDV's notes and mortgages. (*Id.* at ¶ 188.) Plaintiffs further allege that each time a Mortgagee Defendant purchased a mortgage pool it knew or recklessly disregarded knowledge that, *inter alia*, non-conforming appraisals were being used, innocent purchasers were being harmed and concealment allowed the GDC scheme to continue. (*Id.* at ¶ 178.)

### Fannie Mae

Fannie Mae is the largest secondary mortgage purchaser in the United States. (*Id.* at ¶ 164.) Around 1985, Fannie Mae refused to purchase any more GDV mortgages because the appraisal values of the GDV homes were based solely on GDV properties and not on the comparable properties in the open market for that geographic region. (*Id.* at ¶ 165.) Fannie Mae found GDC's practices to be contrary to Fannie Mae's standards. (*Id.*) Among other findings, Fannie Mae found that GDC buyers would not be considered to be well informed of the competitive market and that any financing was on terms generally not available in the community to a typical buyer. (*Id.* at ¶ 165(b).) Fannie Mae discovered that the GDC sales price for lots

---

**13.** Plaintiffs allege that by purchasing the mortgage pools after the enactment of the Competitive Equality Banking Act of 1987 ("CEBA"), the Mortgagee Defendants violated the provision of CEBA that requires mortgage lenders and holders to comply with the Fannie Mae and Freddie Mac definition of market value. (*Id.* at ¶ 181.) The Mortgagee Defendants were motivated to conceal that the mortgages were based on non-conforming appraisal values because exposure would have resulted in large financial losses. (*Id.* at ¶ 183.)

averaged $2.00 per square foot compared to $.80 per square foot for similar houses. (*Id.* at ¶ 165(c).) Moreover, independent appraisers found that the sales prices of GDC houses were 58% to 74% above fair market value.[14] (*Id.* at ¶ 165(d).) Fannie Mae knew that despite GDC's representations to house purchasers to the contrary, there was in fact no noticeable appreciation of real estate prices in the local market. (*Id.* at ¶ 165(f).)

In January 1985, rather than seeking rescission or retendering the mortgages to GDC or GDV, Fannie Mae decided to allow GDV to repurchase any mortgage in default and to guarantee GDV's obligation to pay losses. (*Id.* at ¶ 194.) Fannie Mae agreed to accept mortgages still being processed by it but not yet rejected because " 'of the financial stress to GDV which could be caused by [Fannie Mae's] not purchasing' " them. (*Id.* at ¶ 195) (citation omitted in original). In or about June 1989, Fannie Mae required further protection with respect to previously purchased GDV-originated mortgages by requiring the repurchase of any foreclosed mortgages up to 50% of the aggregate principal balance of the mortgage pool Fannie Mae had purchased, and a letter of credit for $5,100,000. (*Id.* at ¶ 198.) Fannie Mae and GDC conditioned the agreement on the fact that it remain confidential. (*Id.* at ¶ 199.) By remaining silent while knowing GDC and GDV continued to issue mortgages based on non-conforming real estate appraisals, Fannie Mae participated in the fraudulent scheme. (*Id.* at 197.)

### Freddie Mac

Plaintiffs' allegations against Freddie Mac closely resemble those against Fannie Mae. Plaintiffs allege that Freddie Mac knew that GDC's mortgages were overvalued and based on non-conforming appraisals. (*Id.* at ¶ 203). Even though Freddie Mac had the right to require GDV to repurchase the mortgages, suspend GDV from further eligibility to sell mortgages under the Federal Home Loan Mortgage Act ("FHLMA") and suspend GDV as a "seller/servicer" under FHLMA, it agreed not to strip GDV of its privilege to sell mortgages under FHLMA on the condition that GDV agree to repurchase any mortgage in default. (*Id.* at ¶ 204.) In addition, Freddie Mac required GDV to guarantee unconditionally the monthly payments due on the mortgages in the pool. (*Id.*) Plaintiffs allege that Freddie Mac's concealment of GDC's and GDV's practices along with its failure to withdraw GDV as a recognized mortgage seller perpetuated the fraudulent lot and house sales scheme. (*Id.* at ¶¶ 205–06.) Plaintiffs also claim that Freddie Mac, a quasi-public organization chartered by Congress, violated a duty to disclose the scheme to the appropriate governmental and regulatory agencies. (*Id.* at ¶ 205.)

### Chase Federal Bank, FSB

Chase is a federally chartered savings institution located in Florida which entered into agreements with GDC and/or GDV to purchase GDV mortgages in about December 1985. (*Id.* at ¶ 54.) As of November 30, 1990, these mortgages had an approximate aggregate principal balance of $35,000,000. (*Id.*) Plaintiffs claim that when Chase entered into agreements with GDC and/or GDV, Chase required that GDC and/or GDV (1) unconditionally guarantee monthly payments, (2) repurchase foreclosed mortgages up to a ceiling percentage, and (3) deposit $610,000 with Chase to support GDV's obligations. (*Id.* at ¶ 214.)

### C & S Trust

C & S Trust is a federally chartered trust company located in Florida which acted as trustee for the 1989 C & S/PW Public Issue Certificates, approximately $65,475,248 worth of which were sold by GDV through a public offering in 1989. (*Id.* at ¶ 56.) These Certificates were supported by GDV mortgages on

---

14. For instance, in mid–1985, GDC was informed by its four major appraisers, including Gulf Appraisers Consultants, Inc., that they could not continue to appraise GDC properties in light of the "drastic" conclusions they had reached regarding GDC's land values and homesite package prices. (*Id.* at ¶ 324.) One of the appraisers, Roger Hettema, opined that a GDC lot selling for $11,795 to $12,295 would sell on the open market for $4,900 to $7,100. (*Id.* at ¶ 325.) In addition, he pointed out that the price of a GDC house was $55 per square foot when the average price per square foot for a comparable house was $30 to $34. (*Id.*)

GDC houses. (*Id.*) As of November 30, 1990, these mortgages had an approximate aggregate principal balance of $59,700,000.

According to plaintiffs, C & S Trust confirmed its knowledge of GDV's and GDC's fraudulent scheme in the course of the due diligence required in connection with the public offering. (*Id.* at ¶ 207.) Plaintiffs claim that C & S Trust's failure as a fiduciary to require full and accurate disclosure of material facts constituted a knowing concealment of and active participation in the scheme. (*Id.*) Instead of refusing to act as trustee, C & S Trust required GDC and/or GDV to (1) unconditionally guarantee to make the monthly payments due on the mortgages; (2) repurchase defaulted mortgages up to a maximum dollar amount; (3) issue a letter of credit for $21.8 million for the benefit of C & S Trust and Certificate holders; and (4) obtain an insurance policy to guarantee monthly payments. (*Id.* at ¶ 208.)

### Secor

Secor, a federally chartered savings institution, entered into agreements with GDC and/or GDV to purchase GDV mortgages beginning in or about December 1985. (*Id.* at ¶ 57.) As of November 30, 1990, these mortgages had an approximate aggregate principal balance of $3,300,000. (*Id.*) Plaintiffs allege that when Secor entered into agreements with GDC and/or GDV, Secor required that GDC and/or GDV (1) unconditionally guarantee monthly payments and (2) repurchase all foreclosed mortgages. (*Id.* at ¶ 215.)

### S.E. Bank

Plaintiffs claim that as a condition of holding GDV mortgages as trustee in connection with the 1988 S.E. Bank Private Placement Certificates, S.E. Bank required that GDC and/or GDV (a) unconditionally guarantee to make the monthly payments due on the mortgages supporting the Certificates; (b) fund losses on foreclosed properties up to 24% of the aggregate principal balance of its mortgage pools; and (c) obtain letters of credit for the benefit of S.E. Bank and holders of the Certificates. (*Id.* at ¶ 217.)

### Home

Home is a New Hampshire corporation and is a wholly owned subsidiary of AmBase. (*Id.* at ¶ 20.) Home is also categorized by plaintiffs as a City Defendant. Commencing in 1986, Home purchased mortgage pools from GDV with full knowledge of the fraudulent lot and house sales scheme. (*Id.* at ¶ 209.) According to plaintiffs, Home would accept refinanced mortgages based on nonconforming appraisals, whereas independent lenders would not. (*Id.* at ¶ 210.) Mortgagee Defendants that accepted such refinanced mortgages often granted preferred terms such as lower interest rates to further induce the house purchaser to refrain from seeking independent financing and from disclosing the fraudulent practices to the public. (*Id.*) The City Defendants required, as to Home's mortgage pools, that GDC and/or GDV (a) repurchase foreclosed mortgages or substitute them with non-defaulting mortgages and (b) unconditionally guarantee to make the monthly payments due on the mortgages. (*Id.* at ¶ 211.)

### Carteret

Plaintiffs refer to Carteret Bancorp, Inc. ("Carteret Bancorp") and Carteret Savings Bank, FA ("CSB") collectively as "Carteret." (*Id.* at ¶ 23.) Both Carteret Bancorp and CSB are also categorized by plaintiffs as City Defendants. CSB became a wholly owned subsidiary of Carteret Bancorp in or about 1988. (*Id.* at ¶ 22.) CSB conducted its mortgage operations through Carteret Mortgage Company, a division of CSB. (*Id.* at ¶ 23.) Plaintiffs allege that Carteret purchased mortgage pools in the fashion generally described above, and that as a result, Carteret knew of the fraud and forestalled its discovery. (*Id.* at ¶ 212.) After Carteret Bancorp became a wholly owned subsidiary of AmBase in 1988, (*id.* at ¶ 22), Carteret continued to purchase mortgage pools under the condition that GDC and/or GDV: (a) unconditionally make the monthly payments due on the mortgages; (b) repurchase certain foreclosed mortgages, up to a ceiling percentage; (c) deposit $140,000 with Carteret to support GDV's obligations; and (d) obtain letters of credit to secure GDV's obligations which

were issued by, *inter alia,* S.E. Bank and NBC. (*Id.* at ¶ 213.)

### Prudential

In addition to its role as a Financing Defendant and a stockholder of GDC, Prudential purchased or originated mortgages from GDV on properties sold by GDC allegedly with the knowledge that the mortgages had been fraudulently obtained to continue to support the fraudulent sales scheme. (*Id.* at ¶ 218.)

### 5. *The Lot Contract Defendants*

Beginning in or about 1978, the monthly payments due to GDC from plaintiffs and others on their lot contract/notes were pooled (into "lot contract pools") and resold to the Lot Contract Defendants. (*Id.* at ¶ 219.) Approximately 70% of all lot contract/notes were sold between 1986 and 1990. (*Id.*) As of April 25, 1990, the outstanding aggregate principal balance of these lot contract/notes was approximately $783,514,495. (*Id.* at ¶ 220.) GDC was only able to place 26%, or approximately $203,713,768, of the lot contract/notes into pools. (*Id.*) As security, GDC was required to maintain groups of additional contract/notes which were not in default for each Lot Contract Defendant ("substitution pools"). (*Id.*) As of April 1990 these substitution pools had an aggregate face value of $54,846,014. (*Id.*)

GDC used two methods to service the lot contract pools. (*Id.* at ¶ 222.) In the first method, the Lot Contract Defendants acted in a fashion similar to the Mortgagee Defendants. The Lot Contract Defendants authorized GDC to service their contracts, collect and disburse on their behalf and negotiate with the respective lot owners. (*Id.*) In the second method, utilized by Oxford and Greyhound, payments were made by the lot purchasers directly to the Lot Contract Defendants. (*Id.* at ¶ 223.) Under both methods, substitution pools were used as security, and when a sold lot contract/note went into default, GDC would take it back and replace it with a performing contract from that Lot Contract Defendant's substitution pool. (*Id.* at ¶ 224.) However, some or all of the Lot Contract Defendants required additional se-

curity such as (a) an unconditional guarantee by GDC of the payment obligations including a lien upon the assets and/or capital stock of GDC, (b) the issuance of letters of credit, (c) an assignment of GDC's rights to withdraw monies under certain of its escrow agreements, and (d) the placement in trust of deeds to the lots underlying the respective pools. (*Id.* at ¶ 225.)

Plaintiffs allege that all Lot Contract Defendants performed a full business investigation which included a review of GDC's financial statements and operating cash flows, analysis of property location and an on-site property inspection. (*Id.* at ¶ 226.) Merrill Lynch also performed due diligence in connection with its role as an underwriter of various GDC financings. (*Id.* at ¶ 227.) Oxford had extensive experience in both finance services and land and community development. (*Id.* at ¶ 228.) Before 1985, Oxford was involved in a land development project in Florida of over 7,000 lots. (*Id.*) In addition, both prior to its purchase of GDC lot contract pools and subsequently, Oxford has represented to lot purchasers in its pools that it "intensely investigate[s] every facet of a proposed portfolio purchase" and that it "never purchase[s] mortgages where the customer pays an interest rate in excess of what [Oxford] considers[s] to be equitable." (*Id.* at ¶ 229) (citing Oxford First Corporation, *1985 Annual Report,* at 2.)

Plaintiffs claim that the Lot Contract Defendants should have been aware of GDC's fraudulent scheme when they discovered that Fannie Mae and Freddie Mac were no longer accepting GDV-originated mortgages. (*Id.* at ¶ 236.) According to plaintiffs, GDC's knowledge is imputable to each Lot Contract Defendant based on the agency relationship GDC had to the Lot Contract Defendants. (*Id.* at ¶ 230.) Finally, plaintiffs allege that the Lot Contract Defendants remained silent because disclosure of the scheme would make repayment to them impossible and render their collateral worthless. (*Id.* at ¶ 235.)

### 6. *Cravath and Ormsby*

Cravath acted as general counsel to GDC, GDV, and the City Defendants City Trust, AmBase, Home and Carteret. (*Id.* at ¶ 39.)

Ormsby was a partner of Cravath. (*Id.* at ¶ 40.)

Cravath acted as the principal drafter of various prospectuses, loan documents for public and private financings, and public disclosure documents. (*Id.* at ¶ 298.) Cravath and Ormsby prepared GDC's regulatory filings, formulated GDC's public statements, and represented GDC in connection with government investigations and grand jury proceedings. (*Id.*) In addition, Cravath defended GDC and GDV in actions instituted by disgruntled lot and house owners. (*Id.*) GDC, GDV and the City Defendants were collectively one of Cravath's largest clients and generated millions of dollars in legal fees for Cravath. (*Id.*)

Ormsby was Secretary of GDC from 1985 to 1988. (*Id.* at ¶ 299.) Plaintiffs allege that in the course of his duties Ormsby and Cravath acquired actual knowledge of, had a duty to acquire knowledge of, and/or recklessly disregarded knowledge of the GDC scheme. (*Id.*) When Cravath issued opinions, prepared contracts and drafted disclosure documents for GDC and GDV, Cravath and Ormsby knowingly disregarded and omitted and/or obfuscated material facts known to them concerning the fraudulent scheme. (*Id.* at ¶ 301.) Cravath and Ormsby knew that the independent certified public accountants for GDC and GDV did not know of or recklessly disregarded material facts necessary to fairly present their financial condition since 1985. (*Id.* at ¶ 310.) According to plaintiffs, Cravath and Ormsby were aware that having Cravath's name associated with GDC and GDV lent credibility to the companies and their proposed transactions, (*id.* at ¶¶ 301–02), and that disclosure of the fraudulent sales scheme would endanger the viability of the scheme and Cravath's ability to obtain its sizable legal fees paid by GDC and GDV.

Cravath served as general counsel to and advised both City and GDC in connection with the City Dividend and the 1985 ML City Dividend Financing. (*Id.* at ¶ 303.) Representing both parties created a conflict of interest because GDC failed to have independent counsel. (*Id.* at ¶ 304(g).) Given that Cravath was acting as a fiduciary to both

City and GDC, it was obligated to advise both parties according to their own best interest, not favor one party over the other and not allow one client to be used as an instrumentality for the benefit of the other. (*Id.* at ¶ 303.)

In connection with the 1988 S.E. Bank Private Placement Certificates, GDC and Cravath, with the assistance of the Inside Director Defendants and the Director Defendants, pressured the underwriter to omit and hide from disclosure material information that the values of GDC houses and lots were lower than the sales prices, and that GDC sales prices were based on non-conforming appraisals. (*Id.* at ¶ 311.) Cravath knew or recklessly disregarded the fact that truthful disclosure would make impossible or impair GDC's ability to sell the certificates or result in raised financing costs due to investors requesting additional security. (*Id.*) When Cravath was unable to omit similar information from the disclosure documents prepared in connection with the 1989 C & S Public Issue Certificates, it drafted disclosure language in a manner intended to hide and obfuscate these material facts by claiming that the facts resulted from differences in judgment and were based on insufficient data—even though Cravath knew these were material misrepresentations. (*Id.* at ¶¶ 312–13.) In 1990, after the GDC bankruptcy and indictment, GDC counsel admitted for the first time that the cost of the required improvements and amenities to render the lots usable exceeded the GDC sales price for the lot. (*Id.* at ¶ 315.) This information also was omitted from the documents presented in connection with these offerings. (*Id.* at ¶ 316.)

## VI. DISCUSSION

All defendants except Carteret Bancorp and CSB (*see supra* note 3) move to dismiss the Amended Complaint under Rule 12(b)(6). Additionally, City Trust, AmBase, Scharffenberger, Manley, Hatch and Pyne collectively move to dismiss under Rule 12(b)(2). The following discussion addresses each motion.

## A. *MOTION TO DISMISS UNDER RULE 12(b)(2)*

Defendants Scharffenberger, Manley, Hatch and Pyne jointly move to dismiss Counts III and VII of the Amended Complaint (alleging violations of the Land Sales Act and common law fraud) for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). These defendants and plaintiffs agree that the district court's jurisdiction over defendants with regard to the state common law fraud claim and the Land Sales Act claim is based solely on the doctrine of pendent personal jurisdiction. Plaintiffs effectively concede, then, that personal jurisdiction is entirely dependent on the viability of their RICO and securities fraud claims.

The Judicial Improvements Act of 1990 statutorily codified (at 28 U.S.C. § 1367) the *doctrines of pendent claim, pendent party,* and *ancillary jurisdiction* as "supplemental jurisdiction." The statute provides in pertinent part:

> (a) ... in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The supplemental jurisdiction statute became effective on December 1, 1990, and applies prospectively only to civil actions commenced after the effective date. *See* Pub.L. No. 101–650, Title III, § 310(c), 104 Stat. 5114 ("The amendments made by this section shall apply to civil actions commenced on or after the date of the enactment of this Act [December 1, 1990]");

*Loeber v. Bay Tankers, Inc.,* 924 F.2d 1340, 1345 n. 3 (5th Cir.1991) ("Because the instant action commenced before the enactment of the Judicial Improvements Act on December 1, 1990, that act does not apply to the instant case"). The Judicial Improvements Act does not apply to the present case because the original complaint was filed on November 8, 1990—22 days before the Act became effective. Even if this Rule 12(b)(2) motion were decided not under the doctrine of pendent personal jurisdiction but under the supplemental jurisdiction statute, the result would be the same, as the statute provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction...." 28 U.S.C. § 1367(c)(3).

■ Counts I and II (alleging violations of RICO and federal securities laws) are dismissed, as discussed *infra,* as to all defendants moving under Rule 12(b)(6). Accordingly, the doctrine of pendent personal jurisdiction does not justify the exercise of personal jurisdiction in this case, and defendants' motion to dismiss Counts III and VII will be granted.

■ The New Jersey long-arm statute [15] extends to the limits of Constitutional due process protection. *Carteret Sav. Bank, F.A. v. Shushan,* 954 F.2d 141, 145 (3d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). The Third Circuit has stated that "[a] federal court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of the state." *Provident Nat'l Bank v. California Fed. Sav. and Loan Ass'n,* 819 F.2d 434, 436 (3d Cir.1987).[16]

**15.** New Jersey's long-arm rule states in relevant part:

> Service of summons, writs and complaints shall be made as follows:
>
> * * * * * *
>
> ... Upon an individual ... by delivering a copy of the summons and complaint to the individual personally; or by leaving a copy thereof at the dwelling house or usual place of abode ...; or by delivering a copy thereof to a person authorized by appointment or by law to receive service of process on the individual's behalf....

N.J. Civil Practice Rule 4:4–4(a)(1). Under Rule 4:4–4(a)(2), service on an individual defendant by registered, certified or ordinary mail is effective if that individual answers or otherwise responds to such service.

**16.** The Federal Rules of Civil Procedure were amended effective December 1, 1993. Fed. R.Civ.P. 4, which governs summonses, was amended to add Rule 4(k)(2), a special long-arm provision for claims arising under federal law. The amendments do not apply here because the present case was instituted prior to the date on which the amendments took effect.

The Due Process Clause requires that the defendant possess sufficient minimum contacts with the forum state such that the court's exercise of personal jurisdiction does not offend "the traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *see also Jacobs v. Lakewood Aircraft Serv., Inc.*, 493 F.Supp. 46 (E.D.Pa.1980); *Watson McDaniel Co. v. National Pump and Control, Inc.*, 493 F.Supp. 18 (E.D.Pa.1979); *Giangola v. Walt Disney World Co.*, 753 F.Supp. 148, 154–56 (D.N.J.1990). The central concern is the "predictability and fairness of the court taking jurisdiction over the defendant." *Giangola*, 753 F.Supp. at 155.

However, Fed.R.Civ.P. 4(f), which sets the territorial limits within which service of process will be effected upon a party, states:

> [a]ll process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, *and when authorized by statute of the United States or by these rules, beyond the territorial limits of that state*.... (emphasis added).

This rule extends the district court's ability to obtain personal jurisdiction over a defendant beyond the boundaries of the state in which the district court sits by authorizing nationwide service of process by federal statutes or rules. "Where Congress specifically authorizes nationwide service of process, a Federal District Court's jurisdiction encompasses the boundaries of the United States, and due process requires only a defendant in a federal suit have minimum contacts with the United States." *Ginsburg v. Faragalli*, 776 F.Supp. 806, 807 (S.D.N.Y.1991) (citations omitted); *see also Robinson v. Penn Cent. Co.*, 484 F.2d 553, 555–56 (3d Cir.1973) (the 1934 Act).

■ Both RICO and the 1934 Act contain provisions for nationwide service of process. *See* 18 U.S.C. §§ 1965(b), (d) and 15 U.S.C. § 78aa. The Land Sales Act contains no such provision, however, and common law fraud claims are traditionally state claims ungoverned by federal law because there is no general federal common law. It is clear, then, that there is no basis for exercising jurisdiction over Scharffenberger, Manley, Hatch and Pyne for the claims of either common law fraud or violations of the Land Sales Act in the absence of any independent basis for the exercise of jurisdiction under the New Jersey long-arm statute, unless these claims can be heard as pendent to the RICO and 1934 Act claims. As the RICO and 1934 Act claims are dismissed as discussed *infra*, there are no federal claims on which plaintiffs may hang their fraud or Land Sales Act claims.

■ Under Fed.R.Civ.P. 12(b)(2), a complaint must be dismissed if it can be proved that the district court lacks personal jurisdiction over the defendant(s). However, under the doctrine of pendent claim jurisdiction, a federal district court has the power to hear a state law claim when it is so integrally related to a federal claim that the two claims ought to be brought together in one suit. *Lovell Mfg. v. Export–Import Bank of U.S.*, 843 F.2d 725, 731 (3d Cir.1988) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). "Pendent jurisdiction is essentially a discretionary doctrine to permit a party to try in one judicial proceeding all claims arising out of a 'common nucleus of operative fact,' without regard to their federal or state character, where to do so would promote convenience and sound judicial administration." *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–96 (3d Cir.1976) (citing *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138). This is accomplished by allowing a court to entertain additional pendent claims against a defendant who is already a party to the suit. *Lovell Mfg.*, 843 F.2d at 731.

■ A pendent claim analysis begins with a determination of whether the federal claim is of sufficient substance to confer subject matter jurisdiction on the court. *Tully*, 540 F.2d at 196; *see also Francesconi v. Kardon Chevrolet, Inc.*, 703 F.Supp. 1154, 1160 (D.N.J.1988), *aff'd*, 888 F.2d 18 (3d Cir. 1989); *Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 F.2d 96, 105 (3d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989). However, the doctrine of pendent jurisdiction is discretionary, and even after a substantial federal claim is

established, the district court may weigh " 'considerations of judicial economy, convenience and fairness to [the] litigants' " before exercising its discretion in favor of assuming pendent jurisdiction over the state claim. *Francesconi*, 703 F.Supp. at 1160 (citing *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139); *see also Shaffer v. Board of School Dirs.*, 730 F.2d 910, 911–12 (3d Cir.1984); *Robinson v. Penn. Cent. Co.*, 484 F.2d at 555–56.

The court's discretionary exercise of pendent jurisdiction is an issue which remains open throughout the litigation. *Francesconi*, 703 F.Supp. at 1160 (citing *Dumansky v. United States*, 486 F.Supp. 1078, 1089 (D.N.J.1980)). The Third Circuit has held that absent extraordinary circumstances, if the federal count is dismissed on a 12(b)(6) motion or a motion for summary judgment, then the district court should "ordinarily refrain from exercising pendent jurisdiction [over the state law claims]." *Francesconi*, 703 F.Supp. at 1160 (citing *Tully*, 540 F.2d at 196). Therefore, in the Third Circuit, once all federal claims have been dismissed or dropped from a case, the case "simply does not belong in federal court," and "absent extraordinary circumstances, a district court in this circuit [is] powerless to hear claims lacking an independent jurisdictional basis." *Francesconi*, 703 F.Supp. at 1160 (citing *Lovell Mfg.*, 843 F.2d at 735).[17]

In the present case, it is clear that Counts III and VII arise out of the same "common nucleus of operative fact" as Counts I and II. If Counts I and II, the federal claims, were not dismissed for failure to state a claim, Counts III and VII would be proper pendent claims for reasons of judicial economy and convenience. However, given that these federal claims have been dismissed, and that there are no extraordinary circumstances which would warrant the exercise of jurisdiction, the pendent claims doctrine cannot be used to establish personal jurisdiction over these defendants for Counts III and VII.

Third Circuit caselaw makes it clear that once a defendant raises the issue of *in personam* jurisdiction, the plaintiff bears the burden of proving, by a preponderance of the evidence, facts sufficient to establish jurisdiction. *Carteret*, 954 F.2d at 143 n. 1.[18] In the present case, plaintiffs have made it clear that their *only* defense to the 12(b)(2) motions at issue is that jurisdiction is proper because of the pendent claim doctrine. Such a defense, given the dismissal of the federal claims in this action, fails to satisfy their burden of proof. Moreover, it appears that even if plaintiffs had argued that an independent jurisdictional basis existed due to contacts the four moving defendants had with the state of New Jersey, that argument

17. In addition to judicial economy and convenience, another purpose in retaining jurisdiction over a state law claim after the federal claim has been dismissed *is to prevent serious prejudice or unfairness* to the plaintiff which might result from the dismissal of the claim. *Francesconi*, 703 F.Supp. at 1161 (citing *Shaffer*, 730 F.2d at 912–13). Factors which may be considered include undue cost and delay or, perhaps, the expiration of a statute of limitations which precludes a plaintiff from bringing his state claim in the state forum. *The time already invested in litigating the state cause of action, however, is insufficient reason to sustain the exercise of pendent jurisdiction. Francesconi*, 703 F.Supp. at 1161 (citing *Cooley v. Pennsylvania Hous. Fin. Agency*, 830 F.2d 469, 475–76 (3d Cir.1987)).

18. Initially, all jurisdictional allegations by a plaintiff are to be accepted as true and all disputed facts construed in plaintiff's favor at the time when the motion to dismiss is originally made. *Carteret*, 954 F.2d at 142 n. 1. However, the plaintiff must eventually establish jurisdiction by a preponderance of the evidence. *Id.* Once the

defense of a Rule 12(b)(2) motion has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66–67 n. 9 (3d Cir. 1984); *Stranahan Gear Co., Inc. v. NL Indus., Inc.*, 800 F.2d 53, 58 (3d Cir.1986) ("... [A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations"); *Lacovara v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 551 F.Supp. 601, 602 (E.D.Pa.1982) (dismissing complaint in securities action where plaintiff filed no affidavits to establish the facts necessary to confer jurisdiction, and did not respond to defendant's affidavits, because "[w]hen faced with a motion to dismiss for lack of personal jurisdiction filed pursuant to Fed. R.Civ.P. 12(b)(2), a plaintiff must do more than merely allege that jurisdiction exists. He must carry his burden of establishing facts in support of personal jurisdiction").

would fail as well.[19] Accordingly, Scharffenberger, Manley, Hatch and Pyne Askew, Brinckerhoff, Clark and Simons' motion to dismiss Counts III and VII for lack of personal jurisdiction is granted.

## B. MOTIONS TO DISMISS UNDER RULE 12(b)(6)

### 1. Standard of Review

Pursuant to Rule 12(b)(6), a plaintiff's complaint must be dismissed for failure to state a claim if a defendant demonstrates "beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 634 (3d Cir.1989); *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980). All allegations set forth in the complaint must be accepted as true, *see Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972), and all reasonable inferences must be drawn in the plaintiff's favor. *See McKnight v. Southeastern Pa. Transp. Auth.*, 583 F.2d 1229, 1235–36 (3d Cir.1978).

On a 12(b)(6) motion, the district court is limited to the facts alleged in the complaint, not those raised for the first time by counsel in their legal memoranda. *Hauptmann v. Wilentz*, 570 F.Supp. 351, 364 (D.N.J.1983), *aff'd without opinion*, 770 F.2d 1070 (3d Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *Seevers v. Arkenberg*, 726 F.Supp. 1159, 1165 (S.D.Ind.1989) ("This court is not at liberty, however, to consider allegations which do not appear in the complaint, but which are averred only in legal briefs"). The Third Circuit, however, recently held that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgment, "if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993).

Moreover, a plaintiff generally should be allowed to amend its complaint to cure any pleading deficiencies. "Even after a responsive pleading has been filed ... great liberality in allowing amendment of an initial pleading is often appropriate, especially when amendment will further the ends of justice, effectuate presentation of a suit's merits and not prejudice the opposing party." *Kiser v. General Elec. Corp.*, 831 F.2d 423, 427 (3d Cir.1987), *cert. denied sub nom. Parker–Hannifin Corp. v. Kiser*, 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 238 (1988); *see also Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984). Generally, "a district court should give a plaintiff an opportunity to amend his complaint rather than dismiss it when it appears that a more carefully drafted complaint might state a claim upon which relief could be granted." *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir.1985).

Indeed, "it is not only within the power, but is a duty, of a federal court to consider on the merits a proposed amendment of a defective allegation once the court's attention is called to the defect." *Kiser*, 831 F.2d at 427. A "plaintiff should be granted every opportunity to cure defects in its pleadings by amendment, no matter how unpromising its initial attempt." *Sixth Camden Corp. v. Township of Evesham*, 420 F.Supp. 709, 720 (D.N.J.1976). *See also* 5A C. Wright & A. Miller, *Federal Practice & Procedure* § 1357, at 361–65 (1990). This is so because "[c]ourts must be cautious in assessing motions to dismiss, particularly where granting such a motion would terminate the litigation before the parties have had their day in

---

**19.** The Third Circuit has held that while actions taken *within* the forum state by a corporate official in his official capacity may be considered for purposes of establishing jurisdiction over him in his individual capacity, actions taken *outside* the forum state are not enough to establish jurisdiction over that officer. *Educational Testing Serv. v. Katzman*, 631 F.Supp. 550 (D.N.J.1986). Plaintiffs do not allege that defendants had any personal contacts with the state of New Jersey, from either within or outside the state. Indeed, defendants Scharffenberger, Manley, Hatch and Pyne all assert in their declarations filed in support of their 12(b)(2) motion that in their roles as directors of GDC they had no contacts with New Jersey, and plaintiffs offer no evidence to contradict defendants' assertions.

court." *Kiser*, 831 F.2d at 428. In the present case plaintiffs have taken full advantage of the opportunity to amend their complaint, and their complaint now under review must surely include all the facts and legal theories available to them.

### 2. *Interstate Land Sales Full Disclosure Act (Count III)*

#### a. *Aider and Abettor Liability under the Land Sales Act*

Count III charges that the conduct of the defendants violated Section 1703(a) of the Land Sales Act, 15 U.S.C. §§ 1701–20. (Am. Compl. at ¶ 410.) Section 1703(a) of the Land Sales Act provides in pertinent part:

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—

\* \* \* \* \* \*

(2) with respect to the sale or lease of any lot not exempt under section 1702(a) of this title—

(A) to employ any device, scheme or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser;

\* \* \* \* \* \*

Under Section 1709(a), "[a] purchaser or lessee may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title."

Plaintiffs allege that the transactions complained of are subject to the Land Sales Act. (*Id.* at ¶ 409.) However, Section 1702(a)(2)

specifically exempts "the sale or lease of any improved land on which there is a residential ... building ..." from liability under the Land Sales Act. Consequently plaintiffs' only viable claims are those related to the sale of unimproved lots. Plaintiffs note, however, that the improved lot exemption does not impact severely on them because "every plaintiff house purchaser bought a lot first and has a Land Sales Act claim with respect to his lot purchase." (Pls. 12(b)(6) Opp. Br. at 64.)

According to plaintiffs, they are purchasers and GDC is a developer within the meaning of the Land Sales Act. (Am.Compl. at ¶¶ 407–08.) "Developer" is defined in § 1701(5) as

any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision.

"Agent" is defined in § 1701(6) as

any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services.

Plaintiffs do not allege that defendants are developers or agents of developers within the meaning of the statute. They allege only that non-party GDC is a developer under the statute. Indeed, plaintiffs concede that

the liability of each defendant for ... land fraud arises from the fact that each of the defendants conspired with GDC in connection with its fraudulent scheme and aided and abetted the scheme through transactions by which GDC financed its continuing fraudulent activities.

(Pls. 12(b)(6) Opp.Br. at 60.) Because defendants are not "developers" or "agents" within the meaning of the Land Sales Act, the threshold question is whether the plain language of the statute should be interpreted as an absolute bar to aider and abettor liability. If so, Count III must be dismissed as to all moving defendants.

The Third Circuit has not yet expressly decided whether an aiding and abetting claim

can be asserted under the Land Sales Act. The controlling case in this Circuit on liability under that Act is *Bartholomew v. Northampton National Bank of Easton,* 584 F.2d 1288 (3d Cir.1978). In *Bartholomew,* plaintiffs, lot purchasers in a land development in the Pocono Mountains, appealed from the district court's grant of summary judgment to (1) banks involved in the financing of the development project and (2) the sole shareholder of the corporate limited partner of the land developer. As in the instant case, the *Bartholomew* plaintiffs argued that the defendants were liable as aiders and abettors of the non-party development companies.

The district court in *Bartholomew* held that the Land Sales Act, "by its language, limited the class of persons against whom liability can be imposed to 'developers' or 'agents of developers'." *Id.* at 1292. Finding that none of the defendants were "developers" or "agents," the district court entered summary judgment for all defendants on those counts. Addressing the issue of secondary liability, the district court rejected plaintiffs' aiding and abetting theory and held that "no liability can be imposed for aiding and abetting under section 1709 of the Land Sales Act, and further, assuming that such a cause of action existed, plaintiffs failed to raise any material issue of fact as to whether defendants could be found liable." *Id.* at 1293.

The Third Circuit affirmed the summary judgment order. However, the court also observed there that in two cases cited by the plaintiffs, *McCown v. Heidler,* 527 F.2d 204 (10th Cir.1975) and *Timmreck v. Munn,* 433 F.Supp. 396 (N.D.Ill.1977), courts in other Circuits had recognized a cause of action for aiding and abetting under Section 1709 notwithstanding the express language of the statute. Plaintiffs request that this court follow *McCown* and *Timmreck* and deny defendants' motions to dismiss the Amended Complaint as to Count III.

In *McCown,* lot purchasers sued the officers of the corporate developers under the Land Sales Act and on common law fraud principles. The district court rendered summary judgment for defendants. On appeal, the Tenth Circuit remanded on the basis that the district court had imposed improperly narrow limits to liability under the Land Sales Act. The *McCown* court held that "plaintiffs' alleged cause of action may properly be leveled against the individual defendants in this case be they officers, directors, or participating planners." 527 F.2d at 207. The *McCown* court stated that in complex land fraud schemes the developer generally ended up financially insolvent, leaving the defrauded purchasers with no possibility of recovery for their losses, and that to remedy this injustice "[t]he basic protection of the [Land Sales] Act, to be meaningful, must be leveled against the fraudulent planners and profit makers for otherwise [it] would be pragmatically barren." *Id.* In addition, the *McCown* court analogized aider and abettor liability under securities anti-fraud provisions to such liability in the land sales context. As "directors and officers are routinely held liable under the Securities Act," so too should "directors and officers who participate with a corporation or its 'selling agents' in fraud in violation of the Land [Sales] Act [be] guilty of aiding and abetting." *Id.*

. Similarly, *Timmreck* involved defrauded lot purchasers suing under the Land Sales Act on a secondary liability theory. However, the *Timmreck* defendants pertinent to our discussion here were not corporate directors and officers but rather lending institutions which helped to finance the development project by purchasing the plaintiffs' promissory notes secured by their mortgages. Like *McCown, Timmreck* read the "developer" and "agent" definitions in the Land Sales Act liberally, and found that "an exclusion from a statutory definition (whether it be of brokers and dealers, or developers and agents) should not allow a bank to profitably conspire with impunity with others in violation of the law." *Id.* at 407 (citing *Tucker v. Janota,* 75–C–2931 (N.D.Ill. 10/18/76)). *Timmreck,* like *McCown,* saw parallel purposes to securities and land sales anti-fraud provisions and stated that like the Securities Act, the "[Land Sales Act], too, is a flexible antifraud statute, and must be given broad scope." *Id.* (citing *McCown* ).

Additionally, while the *Timmreck* court recognized that "the [Land Sales] Act ex-

empts lending institutions acting in the normal course of their business [in § 1702(a)(3) ]," 433 F.Supp. at 406 (citations omitted), the court also recognized that because courts may "make inquiries into the extent of the financing institution's participation in the project," the plaintiffs there were "entitled to attempt to show that the Bank exceeded the normal scope of financing practices and actively participated in and aided the advancement of a fraudulent scheme, or otherwise assisted in the luring of purchasers for an allegedly dubious project." *Id.* Based on the above reasons, the *Timmreck* court held that there was insufficient evidence to justify the defendant bank's motion to dismiss.

The district court in *Bartholomew* disapproved of the *McCown* and *Timmreck* analogy between liability under the Land Sales Act and under federal securities fraud provisions, reasoning that "[w]hile the Securities Exchange Act's general anti-fraud section applies to 'any person' who engages in prohibited practices in connection with the sale of securities, the Land Sales Act applies only to developers and their agents." *Bartholomew*, 584 F.2d at 1294. As a result, the district court interpreted the language of the Land Sales Act to evidence a "narrower congressional purpose" which could not be "reasonably extended, consistent with its language, to cover a broad spectrum of participants in land developments." *Id.* The *Bartholomew* district court also distinguished *McCown* on its facts. In *McCown*, the defendants were "classic insiders" who had a substantially closer relationship with the developer than the *Bartholomew* defendants had with the non-party developer there. *Id.*

In contrast, the Third Circuit discussed *McCown* and *Timmreck* without expressly deciding whether an aiding and abetting claim is available under the Land Sales Act, as it found that even if it were to follow the reasoning of *McCown*, the trial judge properly entered summary judgment for the defendants. *Id.* The decision, therefore, does not stand for the sweeping proposition advocated by the City Defendants that this Circuit would refuse to impose aider and abettor liability in a case where material issues of fact regarding such liability existed.

 The district court in *Bartholomew* properly cautioned against using the Land Sales Act as a broad net to catch a wide variety of defendants who, as evidenced by the limiting language of the statute, were clearly not intended to be liable thereunder. However, one cannot be insensitive to the plight of those who have been defrauded in land sales schemes; recovery under the Land Sales Act may be difficult if not impossible for defrauded land purchasers because the developers in such cases are invariably insolvent, as in the instant case. Therefore, after considering on one hand the express language of the statute and, on the other, both the willingness of courts in other Circuits to expand the scope of liability under the statute [20] and the reality that if a contrary rule were adopted the statute would be virtually toothless, I conclude that secondary liability under the Land Sales Act may be established by a plaintiff "by proof that defendants provided 'knowing assistance of or participation in a fraudulent scheme'." *Bartholomew*, 584 F.2d at 1294, quoting *McCown*, 527 F.2d at 207, quoting *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 740 (10th Cir.1974). In other words, for a defen-

**20.** *See generally McCown* and *Timmreck; see also Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991) (following *McCown* to hold that "officers, directors and participating planners may be held individually liable" under the Land Sales Act because "to hold otherwise would defeat the purpose of the Act, since it is the officers of the corporation who are behind the alleged fraud") (citations omitted); *Hammar v. Cost Control Marketing and Sales Management of Virginia, Inc.*, 757 F.Supp. 698, 705–707 (W.D.Va.1990) (following *McCown* to deny summary judgment motion of developer's wholly owned subsidiary on grounds that resolution of factual disputes in plaintiffs' favor may show that subsidiary was an aider and abettor); *Fuls v. Shastina Properties, Inc.*, 448 F.Supp. 983, 990 (N.D.Cal.1978) (following *McCown* to grant lot subdivision financier's summary judgment motion because plaintiffs failed to demonstrate factual dispute as to financier's knowledge of or participation in developer's fraudulent representations); *Husted v. Amrep Corp.*, 429 F.Supp. 298 (S.D.N.Y.1977) (refusing to grant developer's corporate officers' Section 9(b) motion to dismiss because of possibility they may be individually liable under the Land Sales Act).

dant who is neither a "developer" nor an "agent" as defined by the statute to be liable as an aider and abettor under the Land Sales Act, the defendant must be, as described by the *Bartholomew* district court, a "classic insider" of the developer. It should be stressed this construction of the language of the statute involves only *minimal* flexibility solely to better effectuate its purpose—"to prohibit fraud and to protect purchasers of land which is part of a common promotional scheme." *Olsen v. Lake Country, Inc.*, 955 F.2d 203, 205 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1587, 118 L.Ed.2d 306 (1992) (citations omitted). However, not everyone who is tangentially connected to a fraudulent land developer is a proper defendant under this interpretation of aider and abettor liability.

### b. *Disposition of Motions to Dismiss*

▮ Applying this analysis to the allegations against defendants here, the motions of the moving Mortgagee Defendants, Lot Contract Defendants,[21] and Financing Defendants as to Count III must be granted. Their connection to GDC as alleged in the Amended Complaint, is far too remote to come under this narrow view of secondary liability under the Land Sales Act. No facts have been pleaded which would support an inference that these defendants conspired with GDC or knowingly assisted or participated in GDC's fraudulent scheme.[22] There have been no facts pleaded from which it could be concluded that the activities engaged in by these defendants were out of the ordinary course of business or in furtherance

of GDC's fraud, and consequently there is no need here for a *Timmreck*-like inquiry "into the extent of the financing institution's participation" in the GDC scheme. *Timmreck,* 433 F.Supp. at 407. It is highly improbable that sophisticated financial institutions would become involved in major transactions such as those alleged by plaintiffs if they had knowledge that GDC was involved in a fraudulent scheme which, if discovered, would be disastrous to their financial stability and business reputation. Under such circumstances a complaint must allege something other than generalized charges of aiding and abetting or conspiracy. Moreover, that Section 1702(a)(3) of the Land Sales Act expressly exempts "the sale of evidences of indebtedness secured by a mortgage or deed of trust on real estate" is additional persuasive support of the Lot Contract and Mortgagee Defendants' motions to dismiss.

For the following reasons, the motion to dismiss submitted jointly by Director Defendants Askew, Clark, Simons and Brinckerhoff will be granted, and the motions of Director Defendants Brown and Ehrling[23] will be denied. The joint motion of City Trust, AmBase, Scharffenberger, Manley, Hatch and Pyne will be granted as to AmBase and denied on the aiding abetting theory as to City Trust, Scharffenberger, Manley, Hatch and Pyne. Had Carteret Bancorp moved for dismissal on this Count its motion most likely would have been granted for the same reasons AmBase's motion was granted.

▮ The only allegations in the Amended Complaint as to Askew, Clark, Simons and

---

**21.** Plaintiffs ask the court to deny Merrill Lynch's motion to dismiss (insofar as Merrill Lynch is alleged to be a Lot Contract Defendant) and claim that they are entitled to discovery on the question of whether Merrill Lynch correctly asserted that it was incorrectly named as a Lot Contract Defendant because its sister company, Merrill Lynch Interfunding, Inc., is the entity which purchased GDC lot contract pools. (Pls. 12(b)(6) Opp.Br. at 88 n. 46.) Plaintiffs' request is denied. The insufficiency of plaintiffs' allegations with respect to Merrill Lynch would also apply to Merrill Lynch Interfunding, Inc.

**22.** Indeed, the Amended Complaint asserts that, had Fannie Mae and Freddie Mac known that GDC used non-conforming appraisals, they never would have purchased the GDV-originated mort-

gages in the first place, (Am.Compl. at ¶ 138(s)), and that their refusal to purchase any additional mortgages upon discovery of GDC's appraisal methods was "devastating to GDC and the [Inside Director Defendants], who understood that it was only a matter of time before the fraudulent scheme was discovered." (*Id.* at ¶ 164.) Plaintiffs can not credibly assert the foregoing and then proceed to allege that Fannie Mae and Freddie Mac knowingly assisted and participated in the GDC fraud.

**23.** Neither Brown nor Ehrling, who move separately, submitted briefs in support of their motions to dismiss. Their notices of motion indicate that they rely upon the briefs, affidavits and memoranda submitted by the other defendants in this action in support of their motions to dismiss.

Brinckerhoff are that they were outside directors of GDC who sat on various committees. Askew, Clark and Simons became outside directors in September 1985, and Brinckerhoff became an outside director in February 1986. (Am.Compl. at ¶¶ 31–34.) As asserted in their supporting brief (the "Outside Director Defs.Supp.Br."), "[b]ecause outside directors are not full-time employees of the corporation, their role has long been recognized as being different and more limited than that of officers and inside directors." (Outside Director Defs.Supp.Br. at 10 n. 11) (citations omitted). Plaintiffs do not allege that Askew, Clark, Simons or Brinckerhoff were in any way involved with the day-to-day activities of GDC, and there are no facts alleged by which plaintiffs could establish that defendants knowingly assisted or participated in the GDC scheme.

■ In contrast, Brown and Ehrling are precisely the type of "classic insiders" who may be liable under the Land Sales Act for aiding and abetting. Brown and Ehrling, senior operating and executive officers of GDC who held various positions from 1972 through 1990, (Am.Compl. at ¶¶ 29–30), had day-to-day responsibility for supervising the operations of GDC and its subsidiaries. (*Id.* at ¶ 322.) Plaintiffs allege that Brown and Ehrling took specific actions to further the GDC scheme which included (a) meeting with GDC's and GDV's appraisers to reassure them of the viability of GDC's appraisal practices, (b) approving settlements with lot and house purchasers in order to fend off adverse publicity, (c) directing GDC salespersons to engage in fraudulent sales practices and (d) directing attempts to hide the scheme. (*Id.*) Additionally, the criminal convictions obtained against Brown and Ehrling strongly suggest, if not conclusively demonstrate, that they both knew of the GDC fraud and actively participated in it.

Similarly, the motion of City Trust, AmBase, Scharffenberger, Manley, Hatch and Pyne is granted only as to AmBase.[24] According to plaintiffs, from 1977 to 1985 City was the sole owner of AmBase (then named The Home Group, Inc.). (*Id.* at ¶ 243.) From 1988 to the present, AmBase has been the sole owner of Carteret Bancorp, which is the sole owner of CSB. (*Id.*) AmBase and Carteret Bancorp are also categorized by plaintiffs as Mortgagee Defendants. Taking into consideration that (1) Section 1702(a)(3) of the Land Sales Act expressly exempts "the sale of evidences of indebtedness secured by a mortgage or deed of trust on real estate," as discussed *supra* pp. 217–218, and (2) the Amended Complaint fails to allege that either AmBase or Carteret Bancorp purchased GDV mortgage pools in anything other than their normal course of business, Count III is dismissed as to AmBase.

■ City Trust, a liquidating trust formed under Delaware law in or about September 1985, was the successor to City, which was a majority owner of GDC from 1977 through 1981 and its sole owner from 1981 through 1985. (Am.Compl. at ¶ 18.) Plaintiffs allege that City and City Trust controlled GDC at all times from 1977 to the present. Plaintiffs also allege that Scharffenberger, Manley, Hatch and Pyne were inside directors of GDC and many of its related and successor companies, (*see generally* chart of inside directors and their positions, *supra* pp. 201–202), and that because of these positions they controlled the operations and business and financial plans of those companies. (Am.Compl. at ¶ 319.)

To support their motion to dismiss, these defendants point to the fact that the Land Sales Act does not contain a "controlling persons" clause and that Congress specifically rejected a proposed amendment which would have added a "common control" clause to the Land Sales Act.[25] (City Defs. 12(b)(6)

---

**24.** City Defendant Home joined not in the briefs submitted by the other City Defendants, but in the Mortgagee Defendants' briefs. I have already granted Home's motion to dismiss in its capacity as a Mortgagee Defendant and, in light of the fact that I am dismissing Count III as to City Defendant AmBase because it purchased mortgages in its normal course of business as did the other Mortgagee Defendants, Count III is

dismissed as to Home in its capacity as a City Defendant.

**25.** *See* Proposed Amendment No. 600 to S.3029 (1968), *reprinted in Housing and Urban Development Legislation of 1968: Hearings before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency,* 90th Cong., 2d Sess., Part 2, 1165 (1968).

Supp.Br. at 67–68). These circumstances are not persuasive; indeed, "[the Land Sales Act] may be extended to controlling stockholders, officers and directors of development companies, although [it] does not have a controlling persons clause." *Gibbes v. Rose Hill Plantation Dev. Co.*, 794 F.Supp. 1327, 1333 (D.S.C.1992), citing *Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir.1991) (footnote omitted). *Kemp*, adopting *McCown*, soundly reasoned that "[t]o hold otherwise would defeat the purpose of the [Land Sales] Act, since it is the officers of the corporation who are behind the alleged fraud." *Gibbes*, 794 F.Supp. at 1333, citing *Kemp*, 940 F.2d at 113. In light of the foregoing, it seems quite possible that plaintiffs, given the opportunity to obtain evidence through the discovery process, might be able to demonstrate that City Trust, Scharffenberger, Manley, Hatch and Pyne knowingly assisted or participated in the GDC scheme. Thus, it would be improper to dismiss Count III on this ground as to these defendants at this preliminary stage.

■ Finally, Cravath and Ormsby's motion to dismiss on the aiding and abetting ground is denied as to Count III. In their supporting brief (the "Cravath and Ormsby Supp.Br."), Cravath and Ormsby, who also join the City Defendants' briefs, assert that they cannot be subject to liability under the Land Sales Act because, *inter alia*, Section 1701(6) expressly excludes "an attorney at law whose representation of another person consists solely of rendering legal services" from the definition of "agent." (Cravath and Ormsby Supp.Br. at 13.) However, I find that the exclusion is a bar to primary liability only, and not to secondary liability. This can be illustrated by analogizing attorney liability to the liability of financial institutions under the Land Sales Act as discussed in *Timmreck v. Munn*, discussed *supra*. Under *Timmreck*, a lending institution may be liable under the Land Sales Act as an aider and abettor—notwithstanding the express exemption of "the sale of evidences of indebtedness secured by a mortgage or deed of trust on real estate" in Section 1702(a)(3). *Timmreck*, 433 F.Supp. at 406. In *Timmreck*, the defendant bank's motion to dismiss was denied because plaintiffs were entitled to gather further evidence to demonstrate that the bank "actively participated in and aided the advancement of a fraudulent scheme. . . ." *Id.* Similarly, it follows that if a complaint sufficiently alleges that an attorney has knowingly assisted or participated in a fraudulent scheme, he or she may be liable as an aider and abettor under the Land Sales Act. Accordingly, a court ruling on a motion to dismiss should allow the plaintiff to proceed with discovery in order to determine the extent of the attorney's involvement with the developer.

■ In the instant case, I found that there were no allegations in the Amended Complaint to support plaintiffs' contention that the Mortgagee, Lot Contract and Financing Defendants could be liable as aiders and abettors, and thus the need for further inquiry into those defendants' activities was obviated. The allegations against Cravath and Ormsby, on the other hand, require a different result. Plaintiffs allege that Cravath was general counsel to GDC and GDV, Ormsby was Secretary of GDC from 1985 through 1988, and that they acted as the principal drafter of various prospectuses, loan documents for public and private financings, public disclosure documents, regulatory filings and public statements. (Am.Compl. at ¶¶ 298–299.) Plaintiffs further allege that when Cravath and Ormsby performed this work for GDC, they knowingly disregarded and omitted and/or obfuscated material facts known to them concerning the GDC scheme. (*Id.* at ¶ 301.) In particular, according to plaintiffs, the disclosure documents prepared in connection with the 1988 S.E. Bank Private Placement Certificates and the 1989 C & S Public Issue Certificates were drafted in a manner intended to conceal material facts regarding the GDC fraud, such as the fact that the values of GDC lots were lower than the sales prices. Accepting these allegations as true, I find that the question of whether Cravath and Ormsby knowingly assisted or participated in the GDC fraud could be answered in the affirmative upon additional discovery. Therefore, Cravath and Ormsby's motion to dismiss on the aiding abetting ground is denied as to Count III.

## C. *Statute of Limitations*

██ Defendants assert, in addition to the substantive defenses discussed *infra*, that plaintiffs' Count III claims do not survive the statute of limitations provision of the Land Sales Act, and that as a result there can be no liability. The Land Sales Act did not become effective until April 28, 1969, and may not be applied retroactively. *Davis v. Rio Rancho Estates, Inc.*, 401 F.Supp. 1045, 1048 (S.D.N.Y.1975). Accordingly, plaintiffs who purchased lots prior to April 28, 1969 have no claim under the Land Sales Act.

Prior to June 21, 1980, an action under the antifraud provisions of the Land Sales Act must have been "... brought within two years after the violation upon which it [was] based. In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser." 15 U.S.C. § 1711. There was no discovery provision. This limitations provision governs where the events giving rise to a claim under the Land Sales Act occurred prior to June 21, 1980. *See, e.g., Sarfati v. Wood Holly Assocs.*, 874 F.2d 1523, 1525–58 (11th Cir.1989). Section 1711 was amended in 1979 to include a discovery provision in order to extend the three-year maximum limitation. This amendment became effective on June 21, 1980. It provides, in pertinent part:

(a) No action shall be maintained under section 1709 of this title with respect to—

\* \* \* \* \* \*

(2) a violation of subsection (a)(2)(A), (a)(2)(B), or (a)(2)(C) of section 1703 of this title more than three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence.

Plaintiffs Jose and Rosa Rolo purchased their lot from GDC by contract dated February 27, 1974. (Am.Compl. at ¶ 17.) Plaintiffs William and Roseanne Tenerelli purchased 12 lots and a house [26] in various GDC communities between 1972 and 1978. (*Id.*) Because these transactions took place before June 21, 1980, the two-year/three-year limita-

tions provision provided in Section 1711 of the Land Sales Act prior to the 1979 discovery amendment applies. Courts construing that bifurcated limitations scheme have held that "'[w]here the statute expressly provides for a tolling period for a fraudulent concealment, and then includes a secondary date which "in no event" can be surmounted, there is good basis for belief that the latter date was intended as an absolute barrier to the filing of the suit.'" *Cook v. Deltona Corp.*, 753 F.2d 1552, 1562 (11th Cir.1985) (quoting *Timmreck*, 433 F.Supp. at 408). In other words, Congress intended to "avoid equitable tolling with respect to the three-year limitations period...." *Cook*, 753 F.2d at 1562 (citations omitted). *See also Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1043 (10th Cir.1980) (three-year limitation in the Securities Act of 1933, 15 U.S.C. § 77m, the statute upon which the Land Sales Act is based, has been held to be an absolute bar, notwithstanding allegations of fraudulent concealment). Additionally, "finding the [Land Sales Act] to contain an absolute bar is consistent with later congressional action [the 1979 amendment to extend the "unduly short" maximum limitation]." *Id.* (quoting H.R.Rep. No. 154, 96th Cong., 1st Sess. 38 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2354).

██ While the three-year period of repose is absolute and not subject to equitable tolling, the two-year period may be tolled. *Timmreck*, 433 F.Supp. at 408–09. However, equitable tolling can only extend this two-year period an extra year, *i.e.* until the three-year "in no event" date. *See Husted v. Amrep Corp.*, 429 F.Supp. 298 (S.D.N.Y.1977) (holding that a claim under the Land Sales Act filed within three but more than two years after the contracts were signed is not barred by the statute of limitations). Under Section 1711 the two-year period begins to accrue upon the "violation," while the absolute three-year period runs from the "sale or lease." In other words, a "violation" need not necessarily occur at the same time that the "sale" is made. This distinction becomes important when, as in the present case, a

---

**26.** As noted *supra,* only sales of unimproved lots are covered under the Land Sales Act. When the

Tenerellis purchased their house is therefore inconsequential.

land purchaser alleges that violations continued after the original signing of the sale contract in order to induce that purchaser to continue making installment payments. The *Husted* court held that

> misrepresentations or fraudulent or deceitful behavior occurring after a conditional land sales contract is signed, for the purpose of inducing continued payment by the buyer to the seller, may be actionable violations of § 1703(a)(2) so long as suit is brought within two years of the conduct complained of and within three years of the "sale" or initial signing of the contract.

429 F.Supp. at 308. In the present case, plaintiffs signed their land sale contracts well over three years before November 8, 1990, the date the original complaint was filed.[27] Accordingly, their claim under the Land Sales Act is time barred despite any allegations regarding equitable tolling and continued violations.

#### d. *Summary of Count III Rulings*

For the reasons set forth in subsections (a) and (b) above, the motions to dismiss of the moving Mortgagee Defendants, Lot Contract Defendants, Financing Defendants, Director Defendants Askew, Clark, Simons and Brinckerhoff, and City Defendant AmBase are granted as to Count III. Similarly, to the extent that they are based on substantive grounds, the motions to dismiss of Director Defendants Brown, Ehrling, Scharffenberger, Manley, Hatch and Pyne, City Defendant City Trust, and defendants Cravath and Ormsby are denied as to Count III. However, since all Count III claims of named plaintiffs Jose and Rosa Rolo and William and Roseanne Tenerelli are barred by the Land Sales Act statute of limitations, as discussed

in subsection (c) above, Count III will be dismissed as to all moving defendants.

#### 3. *Civil RICO (Count I)*

Count I charges that defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. Sections 1962(a)–(d) set forth the prohibited activities which may lead to liability under RICO. Both at the July 28, 1993 hearing and in their opposing brief, plaintiffs conceded that they rest their RICO claim entirely on Sections 1962(c) and (d). *See, e.g.,* Pls. 12(b)(6) Opp.Br. at 5–6.

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Under 18 U.S.C. § 1962(d), "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." If plaintiffs' § 1962(c) claim fails, there can be no liability under § 1962(d). *Schwartz v. Philadelphia Nat'l Bank,* 701 F.Supp. 92, 96 (E.D.Pa.1988) ("a claim cannot be made under § 1962(d) ... in the absence of a viable claim under § 1962(a), (b) or (c)), *aff'd,* 879 F.2d 859 (3d Cir.1989); *see also Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 n. 1 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Gilmore v. Berg,* 820 F.Supp. 179, 184 (D.N.J.1993).

An "enterprise" is defined in § 1961(4) to "include any individual, partnership, corporation, association, or other legal

---

27. On the issue of how to construe the term "sale" for the purposes of Section 1711, the better rule is set forth in *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1043–44 (10th Cir.1980), which holds that, because passage of title should not be the critical factor in determining the accrual of a cause of action, a "sale" takes place at the formation of the initial contract rather than when all installment payments under the contract are paid. *Accord Rodriguez v. Banco Cent.,* 727 F.Supp. 759, 764 (D.P.R.1989) (following *Aldrich* and noting that "regulations

issued under the Land Sales Act define sale as 'any obligation or arrangement for consideration to purchase' ") (quoting 24 C.F.R. § 1710.1(n)). Plaintiffs' Land Sales Act claim would still be time barred even if the "sale" was measured from the date the final installment payments were made because plaintiffs have not pleaded that they continued to make any installment payments up until at least November 8, 1987, *i.e.* within three years of the date of the filing of the complaint in this action.

entity, and any union or group of individuals associated in fact although not a legal entity." Included in the lengthy list of predicate acts which may be "racketeering activity" are mail fraud, wire fraud and securities fraud, activities which plaintiffs allege are the predicate acts here.[28] 18 U.S.C. § 1961(1). Under § 1961(5), a "pattern of racketeering activity" "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

Although it is primarily a criminal statute, RICO provides for a private right of action for a civil remedy:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). Plaintiffs allege that they were injured by defendants' RICO violations. (Am.Compl. at ¶ 404.)

The Third Circuit has held that to state a claim under § 1962(c), a plaintiff must allege the following four elements:

(a) the existence of an enterprise affecting interstate commerce;

(b) that the defendant was employed by or associated with the enterprise;

(c) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and

(d) that he or she participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts.

*Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir.1989). Defendants assert

that plaintiffs fail to satisfy these § 1962(c) pleading requirements.

As discussed *infra*, it is clear that plaintiffs fail to allege a valid RICO enterprise in the Amended Complaint and that such a failure would warrant dismissal of the Amended Complaint's RICO count. In their opposing brief, however, plaintiffs attempt to replead their RICO enterprise theory. (Plaintiffs' new RICO theory will be referred to hereinafter as the "Revised RICO Allegations.") Courts have held that on a 12(b)(6) motion, a district court is limited to the facts alleged in the *complaint*, not those raised for the first time in a legal memorandum. *See supra* p. 214. On the other hand, the Third Circuit recognizes the need to allow a plaintiff to amend his or her complaint if a deficiency can be cured by repleading. *Supra* p. 214. In the present case, I will treat the Revised RICO Allegations as a motion to amend so that plaintiffs will not seek leave to amend the already Amended Complaint. This section of the opinion, then, will analyze plaintiffs' RICO claim as alleged in (a) the Amended Complaint and (b) the Revised RICO Allegations.

#### a. *The Amended Complaint*

Plaintiffs allege that "the defendants are persons within the meaning of RICO, 18 U.S.C. § 1961(3), and their conduct and continuing activities constituted a RICO enterprise which was engaged in interstate commerce and which is continuing." Am.Compl. at ¶ 393. Defendants assert that this single sentence does not allege the three elements necessary to prove the existence of a RICO enterprise as set forth by the Third Circuit: "(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages." *United States v. Pelullo*,

---

**28.** Plaintiffs' allegations that defendants' violations of the Land Sales Act are predicate acts for RICO purposes, Am.Compl. at ¶¶ 398, 400, provide no support for the RICO claim because the Land Sales Act is not included in the list in Section 1961(1) of violations which may constitute predicate acts. Even if Land Sales Act violations were proper predicate acts under RICO,

they would be insufficient as to the defendants whose motions to dismiss Count III have been granted herein. *See LaRoe v. Elms Securities Corp.*, 700 F.Supp. 688 (S.D.N.Y.1988) (holding that where federal securities fraud claim is dismissed, it cannot be considered a predicate act for purposes of RICO allegations).

964 F.2d 193, 211 (3d Cir.1992) (citing *United States v. Riccobene*, 709 F.2d 214, 221–24 (3d Cir.), *cert. denied sub nom. Ciancaglini v. United States*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)); City Defs. 12(b)(6) Supp.Br. at 14. The Amended Complaint fails to allege a valid enterprise; however, this deficiency stems not from plaintiffs' failure to plead facts constituting each element essential to prove the existence of a RICO enterprise (as urged by the City Defendants) but rather from plaintiffs' outright negation of the third element.

In *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985), the Third Circuit reversed the trial court's dismissal of a RICO cause of action. The trial court "conceded that each of the defendants fell within the literal meaning of the definition of 'enterprise' provided in section 1961(4)," but ruled that Seville did not state a cause of action under RICO because it failed to plead the three attributes of an enterprise outlined in *Riccobene. Id.* at 789. *Seville* reversed the dismissal, concluding that

> the district court confused what must be *pleaded* with what must be *proved. Riccobene* and [*U.S. v.*] *Turkette* [452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)] certainly stand for the proposition that a plaintiff, to recover, must *prove* that an alleged enterprise possesses the three described attributes. But neither case speaks to what must be *pleaded* in order to state a cause of action. The district court erred in applying the *Riccobene–Turkette* proof analysis to the allegations in Seville's complaint.

*Id.* at 790 (emphasis added). The *Seville* court reasoned that under the more liberal requirements of "notice" pleading

> it is enough that a complaint put the defendant on notice of the claims against him. It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action....

*Id.* (citation omitted). *See also Pelullo*, 964 F.2d at 211 ("These three issues [the *Ricco-*

*bene* requirements] are questions of fact, which ... must be resolved by the jury.")

In light of the holding in *Seville*, it would be improper to find that plaintiffs failed to plead a proper RICO enterprise because they failed to allege the existence of these three requirements. However, it is *not* improper to find that "by [their] pleading [plaintiffs have] affirmatively precluded [themselves] from proving at trial that [defendants] formed an 'enterprise'." *Seville*, 742 F.2d at 790 n. 5. The *Seville* court noted that the district court correctly rejected Seville's RICO conspiracy allegations because Seville had limited its "allegations of conspiracy to the underlying offenses," thereby "affirmatively negat[ing] the existence of the third *Riccobene* factor: an enterprise separate and apart from the pattern of activity in which it engages." *Id.*

 Similarly, plaintiffs here have alleged that the "conduct and continuing activities [of the defendants] constituted a RICO enterprise...." Am.Compl. at ¶ 393. It is a well-established principle of RICO law that the activity complained of must be separate and distinct from the enterprise itself. *See, e.g., United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981); *Pelullo*, 964 F.2d at 210; *Riccobene*, 709 F.2d at 221; *Seville*, 742 F.2d at 790. In short, by defining the enterprise in the Amended Complaint as the racketeering activity itself, plaintiffs have precluded themselves from proving a RICO enterprise. Accordingly, plaintiffs have failed to state a RICO claim in their Amended Complaint.

### b. *The Revised RICO Allegations*

The Revised RICO Allegations define the enterprise as follows:

> [T]he defendants who were officers, directors and controlling shareholders [29] of GDC, while they were so employed by or associated with GDC and while it was engaged in interstate and foreign commerce, or in activities which affect interstate and foreign commerce, conducted or participated, directly and indirectly, in the conduct of the affairs of GDC and its subsidiaries

29. City Trust is the only controlling shareholder named as a defendant in this action.

through a pattern of racketeering activity in violation of § 1962(c) of the RICO Act.... [T]he RICO liability of the remaining defendants arises from the fact that each of them aided and abetted the fraudulent scheme and conspired in connection with it through transactions by which GDC obtained financing for its continuing fraudulent activities.

Pls. 12(b)(6) Opp.Br. at 12–13, 14. In other words, plaintiffs shift from alleging in the Amended Complaint that the conduct and activities of all defendants constituted a RICO enterprise to alleging that GDC and its subsidiaries constituted a RICO enterprise. As explained below, the Revised RICO Allegations fail to state a RICO claim because plaintiffs have not pleaded that the RICO persons are distinct from the enterprise.

### i. *Primary Liability under the Revised RICO Allegations*

 In the Third Circuit, an essential requirement of a § 1962(c) RICO claim is that the culpable "person" and the "enterprise" must be separate and distinct entities.[30] *Brittingham v. Mobil Corp.*, 943 F.2d 297, 300 (3d Cir.1991); *Saporito v. Combustion Eng'g, Inc.*, 843 F.2d 666, 678 (3d Cir. 1988), *cert. granted and judgment vacated in part on other grounds*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989); *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1359 (3d Cir.1987); *B.F.*

*Hirsch v. Enright Refining Co.*, 751 F.2d 628, 633 (3d Cir.1984). This distinctiveness requirement has been applied on motions to dismiss, and is therefore properly one of pleading rather than one of proof. *See generally Petro–Tech; Glessner v. Kenny*, 952 F.2d 702, 713 (3d Cir.1991). Because plaintiffs have failed to plead that the RICO "persons" in this case are separate and distinct from the "enterprise," such a pleading cannot withstand defendants' motions to dismiss.[31]

In the Revised RICO Allegations, plaintiffs claim that GDC's officers, directors and controlling shareholder are "persons" who are liable under § 1962(c) for participating in the affairs of "enterprise" GDC and its subsidiaries. Plaintiffs cite *Petro–Tech*, 824 F.2d at 1351, to stand for the proposition that a corporate entity which actually benefitted from frauds committed in its name could properly be named as a RICO enterprise in a claim against others alleged to have been the persons who participated in the enterprise's activities through a pattern of racketeering activity if the enterprise was not named as a RICO "person" or as an aider and abettor of "persons." Additionally, plaintiffs claim that *Petro–Tech* indicates that where a passive corporation is victimized by RICO persons and drained of funds, or used to extract money from third persons, it may properly be cast as the RICO enterprise. *Id.* at 1358–60; Pls. 12(b)(6) Opp.Br. at 8–11. Plaintiffs assert that they have alleged that the "per-

---

**30.** There is no distinctiveness requirement in the Third Circuit for § 1962(a) claims, and the Third Circuit has reserved decision on the question of whether such a requirement exists for claims under § 1962(b). *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1189–91 (3d Cir.1993).

**31.** Because there is no claim under § 1962(c), no liability can attach for conspiracy under § 1962(d). *See supra* p. 224. Even if, as plaintiffs assert, a conspiracy claim could survive the dismissal of a substantive RICO claim, plaintiffs' conspiracy claim would be dismissed. Under *Shearin v. E.F. Hutton*, 885 F.2d 1162, 1166–67 (3d Cir.1989), a § 1962(d) claim requires allegations of the period of the purported conspiracy, the object of the conspiracy, the actions of the alleged conspirators taken to achieve that object, an agreement among the defendants to commit the predicate acts and knowledge on the part of the defendants that the predicate acts were part

of a pattern of racketeering activity. Plaintiffs make only vague, conclusory allegations of conspiracy which fail to satisfy these specific pleading requirements. *See, e.g.,* Am.Compl. at ¶¶ 6, 400 ("The defendants joined in a conspiracy to accomplish this fraudulent scheme and/or aided and abetted GDC, GDV and each other in carrying it out"; "Each of the defendants engaged in a pattern of racketeering activity and each engaged in at least two acts of mail fraud or wire fraud in the sale of securities or land or conspiracy to do so or conspiracy to violate 18 U.S.C. § 1962(a), (b) or (c) within a 10–year period"). "A general allegation of conspiracy ... is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action." *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 201–02 (3d Cir.1991), quoting *Black & Yates, Inc. v. Mahogany Ass'n*, 129 F.2d 227, 231 (3d Cir.), *cert. denied*, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942).

sons" are sufficiently distinct from the "enterprise" since the Amended Complaint alleges that GDC's officers, directors and controlling shareholder used GDC to extract money from plaintiffs and drained GDC of its funds, principally through the $100 million City Dividend. Pls. 12(b)(6) Opp.Br. at 8–11. In other words, plaintiffs base their distinctiveness argument not on the theory that GDC benefitted from frauds committed in its name, but rather on the theory that it was the passive victim of the racketeering activities engaged in by its officers, directors and controlling shareholder.[32]

In response, defendants state that plaintiffs do not allege the requisite distinctiveness. City Defs. 12(b)(6) Reply Br. at 13–16. "Since a corporation cannot operate except through its officers and agents, a corporate 'enterprise' and its employees are not separate and distinct for the purposes of § 1962(c)." *Pagnotti Enters., Inc. v. Beltrami*, 787 F.Supp. 440, 446 (M.D.Pa.1992) (citing *Tarasi v. Dravo Corp.*, 613 F.Supp. 1235, 1237 (W.D.Pa.1985)). Defendants also cite *Glessner v. Kenny*, 952 F.2d 702, 713 (3d Cir.1991), to support their contention that allowing a corporation to be pleaded as an enterprise controlled by its officers or its parent as defendants would be an "absurd result." Finally, defendants note that under *Glessner* a theoretically viable § 1962(c) claim might be made out where the corporation was the enterprise and its individual officers by themselves were the defendants, so long as the individual named as a "person" had "participated in a pattern of activity that extended beyond the particular scheme that caused the injury to the plaintiffs." *Id.* Defendants conclude that plaintiffs cannot avail themselves of this theory because the Amended Complaint and the plaintiffs' opposing brief fail to make such allegations. A brief review of Third Circuit jurisprudence on the issue at hand will be helpful in fram-

ing the discussion of the parties' arguments, which follows.

*Enright* was the first Third Circuit case to hold that the "person" charged with a violation of § 1962(c) must be distinct from the "enterprise." 751 F.2d at 633–34. The *Enright* court noted that the plain language of the RICO statute provides that the "person" must be "employed by or associated with"— and therefore separate from—the "enterprise." *Id.* In other words, the defendant Enright Refining Co. could not simultaneously be both the defendant and the enterprise, because it would be illogical to say that a corporation was employed by or associated with itself. *Id.* at 633. The *Enright* court looked to the legislative history of § 1962(c) and found that

> [o]ne of the Congressional purposes in enacting RICO was to prevent the takeover of legitimate businesses by criminals and corrupt organizations. It is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity....

*Id.* (citations omitted).

This holding has been reaffirmed and expanded by the Third Circuit. *Petro–Tech* interpreted *Enright* as holding that "§ 1962(c) was intended to govern only those instances in which an 'innocent' or 'passive' corporation is victimized by the RICO 'persons,' and either drained of its own money or used as a passive tool to extract money from third parties." 824 F.2d at 1359. Further, *Petro–Tech* extended the *Enright* rule to hold that a corporate "enterprise" cannot be held vicariously liable for the § 1962(c) violations of its employees, either for aiding and abetting or under a theory of respondeat superior. To hold otherwise, reasoned the *Petro–Tech* court, would circumvent the holding in *Enright* by making the "victim" enter-

---

**32.** Interestingly, in the midst of plaintiffs' description of how GDC was drained and victimized by the "persons" who allegedly conducted its affairs, plaintiffs also claim that GDC "actually benefitted" from the fraudulent scheme. Pls. 12(b)(6) Opp.Br. at 10–11. Such a statement is inherently contradictory, and it is obviously an attempt by plaintiffs to avoid dismissal by parrot-

ing all the language used in *Petro–Tech*, regardless of the fact that doing so does not make any sense. "'A RICO complaint is not a mix and match game in which plaintiffs may artfully invoke magic words to avoid dismissal.'" *Olick v. Dippel*, 1993 WL 313363, 1993 U.S.Dist. LEXIS 12986 (E.D.Pa. Aug. 4, 1993), quoting *Glessner v. Kenny*, 952 F.2d 702, 714 (3d Cir.1991).

prise liable. *Id.* *Brittingham* similarly followed the *Enright* rule; the *Brittingham* court affirmed the grant of summary judgment to the defendants there because the alleged enterprise (an association of Mobil, Mobil Chemical and their advertising agencies) was not distinct from the defendants (Mobil and Mobil Chemical) for the purposes of *Enright.* The Third Circuit in *Brittingham* expanded the *Enright* rule by holding that

> a § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation. A corporation must always act through its employees and agents, and any corporate act will be accomplished through an "association" of these individuals or entities. [T]he *Enright* rule would be eviscerated if a plaintiff could successfully plead that the enterprise consists of a defendant corporation in association with employees, agents, or affiliated entities acting on its behalf.

943 F.2d at 301.

■ Pursuant to *Enright* and the cases which follow its distinctiveness rule, it is clear that the Revised RICO Allegations, in which GDC is the "enterprise" and City Trust and GDC's officers and directors are the defendant "persons," fail as to City Trust. As controlling shareholder of GDC, City Trust is not sufficiently distinct from GDC to be liable as a RICO "person" under § 1962(c). Noting that *Petro–Tech* upheld the dismissal under Rule 12(b)(6) of claims against the parent when its subsidiary was named as the enterprise, the Third Circuit in *Brittingham* held that "[w]ithout additional allegations ... a subsidiary corporation cannot constitute the enterprise through which a defendant parent corporation conducts racketeering activity.... Claims will be dismissed when the enterprise and defendant, although facially distinct, are in reality no different from each other." *Brittingham,* 943 F.2d at 302–303 (footnote omitted) (citing *Petro–Tech,* 824 F.2d at 1358–60). *See also Glessner,* 952 F.2d at 710–11 (following *Brittingham* and *Petro–Tech* to uphold the dismissal under Rule 12(b)(6) of a § 1962(c)

claim). The Third Circuit held as recently as three months ago that

> [a]fter *Brittingham* and *Glessner,* it is still theoretically possible for a parent corporation to be the defendant and its subsidiary to be the enterprise under section 1962(c). However, the plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary. A RICO claim under section 1962(c) is not stated where the subsidiary merely acts on behalf of, or to the benefit of, its parent.

*Lorenz v. CSX Corp.,* 1 F.3d 1406, 1412 (3d Cir.1993). In the present case, it is clear that plaintiffs' allegations are insufficient to establish that City Trust played a role distinct from that played by GDC. Accordingly, the § 1962(c) claim against City Trust must be dismissed because the *Enright* requirement of distinctiveness between the alleged RICO "person" and "enterprise" has not been satisfied.

■ The same principle applies when corporate *employees* are alleged to be "persons" who have conducted the affairs of a corporate "enterprise." In an instance where not a corporate *parent* but a corporate *employee* "merely acts on behalf of, or to the benefit of, its [employer]," *Lorenz,* 1 F.3d at 1412, the same result will obtain: the § 1962(c) RICO claim will be deficient because the corporate employee is not sufficiently distinct from the "enterprise" as required under the *Enright* rule. The *Glessner* court considered the question of whether the individual defendants there could be considered distinct from the corporations deemed the enterprise, and concluded that because the activity allegedly conducted by the defendants was "indistinguishable from that alleged as to the corporations," the defendants were not distinct from the enterprise. *Glessner,* 952 F.2d at 714. The *Glessner* court also cited *Banks v. Wolk,* 918 F.2d 418, 424 (3d Cir.1990), to note that where the Third Circuit had previously let a § 1962(c) action stand against individual defendants, those defendants "had allegedly participated in a pattern of activity that extended beyond the particular scheme that caused the injury

to the plaintiffs." *Id.* at 713. Indeed, just as the *Lorenz* court held that a corporate parent may be properly pleaded as a RICO "person" if the plaintiff could show that the parent "played a role in the racketeering activity which is distinct from the activities of its subsidiary," *id.*, in light of *Glessner* an individual employee of a corporate RICO "enterprise" may be a proper "person" if he or she "participate[s] in a pattern of activity that extend[s] beyond the particular scheme that caused the injury to the plaintiffs." *Glessner*, 952 F.2d at 713. As the *Brittingham* court stated regarding RICO claims in which a corporate parent is named as a defendant, "[c]laims will be dismissed when the enterprise and defendant, although facially distinct, are in reality no different from each other." *Brittingham*, 943 F.2d at 302–303 (footnote omitted) (citation omitted). The same reasoning applies when, as in the present case, corporate employees are named as defendants.

In the present case, plaintiffs have clearly failed to allege that GDC's corporate officers or directors engaged in any activities which extended beyond the GDC scheme and caused plaintiffs' injuries. Moreover, plaintiffs' claim that GDC was an innocent, passive corporation which was victimized by its corporate officers, directors and controlling shareholder, Pls. 12(b)(6) Opp.Br. at 10–11, is wholly undermined by the simple fact that, as plaintiffs themselves report, "GDC has been indicted and pled guilty to criminal violations of the law for many of the acts and practices alleged in this complaint." Am.Compl. at ¶ 37. Plaintiffs also state that "GDC, its Chairman, its President and other officers have been convicted of multiple mail fraud offenses." Pls. 12(b)(6) Opp.Br. at 10–11. In other words, plaintiffs effectively concede that GDC and the defendants which are alleged to be RICO "persons" in the Revised RICO Allegations participated in substantially the same activities. Given these statements by plaintiffs, there is no question that the Revised RICO Allegations fail to demonstrate that the "enterprise" (GDC) is distinct from the "persons" (GDC's officers, directors and controlling shareholder) as required by the *Enright* rule. Accordingly, Count I will be dismissed

as to City Trust and all officers and directors. Moreover, because there is no primary liability under § 1962(c), plaintiffs' claim that the remainder of the defendants are aiders and abettors of the RICO "persons" must fall; because plaintiffs allege facts in the Amended Complaint and in their brief which negate the existence of an enterprise, Count I will be dismissed as to all moving defendants.

### ii. *Aider and Abettor Liability Under the Revised RICO Allegations*

Plaintiffs' opposing brief casts the bulk of the defendants (specifically, all Mortgagee, Financing and Lot Contract Defendants, Am-Base, Home, Carteret and Cravath) not as primary wrongdoers but as aiders and abettors of GDC's officers, directors and controlling shareholder. The motions to dismiss of all moving defendants categorized in the Revised RICO Allegations as RICO aiders and abettors would be granted as to Count I consistent with the recent Supreme Court decision in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), even if plaintiffs' RICO allegations were properly pleaded.

To buttress their argument that liability can attach under § 1962(c) to this group of alleged aiders and abettors, plaintiffs rely primarily on *Petro–Tech*, 824 F.2d at 1356–58, which held that aiding and abetting the commission of two predicate acts is sufficient to bring the aider and abettor under the scope of RICO. *See also Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir.1990) ("RICO recognizes liability for those who merely aid and abet the underlying predicate offenses") (citing *Petro–Tech*, 824 F.2d at 1356–58). Plaintiffs, however, allege not that defendants aided and abetted the commission of any *predicate acts* but rather only that defendants "aided and abetted *the fraudulent scheme* ...." Pls. 12(b)(6) Opp.Br. at 14 (emphasis added). Moreover, although the Third Circuit has recognized claims for aiding and abetting liability under § 1962(c) in the past (*i.e.* pre-*Reves*), plaintiffs' opposing brief fails to discuss the impact of *Reves* on those earlier decisions. In this case, plaintiffs' argument cannot stand in the wake of *Reves*.

In *Reves,* the Supreme Court interpreted the scope of § 1962(c), particularly the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." —— U.S. at ——, 113 S.Ct. at 1169. The Supreme Court expressly rejected petitioner's argument that the phrase "conduct or participate" should be interpreted broadly to include any type of participation in the affairs of the enterprise. *Id.* Instead, the Court held that the term "conduct" in the context of the statute means "to lead, run, manage or direct." *Id.* Similarly, the Court rejected petitioner's claim that the term "participate" be used "as a synonym for 'aid and abet.'" *Id.* at ——, 113 S.Ct. at 1170. The Court held that within "the context of § 1962(c), 'participate' appears to have a narrower meaning" (*id.*), and explained that

> [o]nce we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs.

*Id.* Thus, the Court stated that "it is clear that Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id.* at ——, 113 S.Ct. at 1172 (footnote omitted).

The Court held that liability under § 1962(c) is limited:

> § 1962(c) cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just their *own*

affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself—but it would be consistent with neither the language nor the legislative history of § 1962(c) to interpret it as broadly as petitioners and the United States urge.

*Id.* at ——, 113 S.Ct. at 1173 (emphasis in original). *Reves* therefore held that a company's outside auditors could not be held liable under § 1962(c) because they did not participate in the "operation or management" of the company.

Courts in the Third Circuit have already applied the *Reves* "operation or management" test of participation in the affairs of a RICO enterprise, and the result is that the scope of liability in § 1962(c) cases is being viewed quite narrowly.[33] *See University of Md. at Baltimore v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993) (expressly holding that the *Reves* test should be applied on motions to dismiss, and affirming district court's grant of defendant accounting firm's motion to dismiss RICO complaint on grounds that "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.... In other words, the person must knowingly engage in '*directing* the enterprise's affairs'....") (citation omitted) (emphasis added in quotation); *Fidelity Federal Sav. and Loan Ass'n v. Felicetti,* 830 F.Supp. 257, 260 (E.D.Pa. 1993) (granting defendant real estate appraisers' summary judgment motions because "even where the wrongdoers provide misleading or fraudulent information which significantly influences a major decision of the enterprise, this still does not constitute

---

**33.** Courts in the Southern District of New York have interpreted the *Reves* decision similarly. *See, e.g., Chamarac Properties, Inc. v. Pike,* 1993 WL 427137 at *3, 1993 U.S.Dist. LEXIS 14593 at *10 (S.D.N.Y. October 15, 1993) ("*Reves* has been interpreted to require that a defendant exercise some measure of control or direction over the enterprise as it has been pleaded by the plaintiff") (citing *United States v. Altman,* 820 F.Supp. 794, 796 (S.D.N.Y.1993); *Amalgamated Bank of N.Y. v. Marsh,* 823 F.Supp. 209, 220

(S.D.N.Y.1993)); *Strong & Fisher Ltd. v. Maxima Leather, Inc.,* 1993 WL 277205 at *1 1993 U.S.Dist. LEXIS 10080 at *3–*4 (S.D.N.Y. July 19, 1993) (finding that major creditors of alleged enterprise could not be liable for violations of § 1962(c) under the *Reves* definition of "conduct or participate" even though they "had substantial persuasive power to induce management to take certain actions and had the legal authority to take other actions that could affect [the enterprise]").

'operation or management' of the enterprise"; *Gilmore v. Berg*, 820 F.Supp. 179, 182–83 (D.N.J.1993) (holding that the "preparation by an [attorney and accountant] of [ ] allegedly misleading opinion and forecast letters merely constituted the rendition of professional services to [plaintiff]" and that "[s]uch conduct does not constitute participation in the direction of the affairs of any of the corporate entities...."). *Reves* and the cases which have applied its "operation or management" test have indisputable ramifications for Third Circuit RICO claims, such as the one at bar, that seek to impose liability (primary or secondary) on remote parties.

 Plaintiffs' theory for holding defendants liable as aiders and abettors is based on *Petro–Tech*, where the Third Circuit held that *"if all of RICO's other requirements are met,* an aider and abettor of two predicate acts can be civilly liable under RICO." 824 F.2d at 1356 (emphasis added). It appears that aider and abettor liability still exists under *Petro–Tech*, but only insofar as it is consistent with the *Reves* "operation or management" test. Because *Reves* has interpreted § 1962(c) to require that a defendant participate in the operation or management of an enterprise, this requirement necessarily becomes an element which a plaintiff must plead in order for there to be aider and abettor liability under *Petro–Tech*. It would be illogical to allow RICO plaintiffs to circumvent the limits on liability under § 1962(c) as defined in *Reves* simply by allowing them to use the label "aider and abettor" to impose liability on a defendant whose level of involvement with an enterprise does not constitute operation or management. Of course, this interpretation does not suggest that "outsiders" of an enterprise can never be liable for RICO violations. *Reves* clearly provides that "'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself...." *Reves*, —— U.S. at ——, 113 S.Ct. at 1173 (emphasis in original). In sum, a defendant may be liable for aiding and abetting under § 1962(c) (*i.e.* be liable without actually having committed at least two predicate acts as required by the statute)

only if that defendant has both (1) aided and abetted the commission of at least two predicate acts (as required by *Petro–Tech* ) *and* (2) participated in the operation or management of the enterprise (as required by *Reves* ).

Defendants assert that there can be *no* aider and abettor liability whatsoever under § 1962(c) after *Reves. See, e.g.,* Prudential Supp.Br. at 15–18. Such a ruling would go too far because, as discussed above, aider and abettor liability under *Petro–Tech* is not inconsistent with the "operation or management" test set forth in *Reves.* In addition, it should be noted that a court in the Third Circuit has expressly examined the impact of *Reves* on the viability of § 1962(c) aiding and abetting claims and has held that such claims survive *Reves. Fidelity Federal* rejected the argument that "the *Reves* decision implicitly and explicitly makes aider and abettor liability inconsistent with § 1962(c) liability and the 'operation or management test,'" 830 F.Supp. at 261, and found that the portion of the *Reves* decision which refers to aiding and abetting "is limited to the [*Reves* ] Court's attempt to define the word 'participate' as it is used in the RICO statute and is not dispositive of the [defendants'] argument...." *Id.* As a result, the *Fidelity Federal* court "conclude[d] that the *Reves* decision does not alter the nature of RICO to such an extent as to warrant the implicit reversal of the *Petro– Tech* holding." *Id.* Indeed, that another post-*Reves* decision has ruled on § 1962(c) aiding and abetting claims without any analysis whatsoever of whether *Reves* has eliminated such liability suggests that courts are not willing to find that the implications of *Reves* are as far-reaching as defendants here propose. *See, e.g., Chamarac Properties, Inc. v. Pike,* 1993 WL 427137, 1993 U.S.Dist. LEXIS 14593 (S.D.N.Y. October 19, 1993) 1993 WL 427137 at *4–*8, 1993 U.S.Dist. LEXIS 14593 at *8–*16 (dismissing aiding and abetting claims on grounds that complaint failed to allege substantial assistance was rendered by defendants).

 Applying the *Reves* test to the present case, it is apparent that plaintiffs' allegations cannot permit an inference "that

[the defendants alleged in the Revised RICO Allegations to be aiders and abettors] participated, either directly or indirectly, in the conduct or the affairs of the enterprise," and that they thereby fail to satisfy the third § 1962(c) pleading requirement announced by the Third Circuit in *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir.1989). As discussed in Section VI.B.2.b. *supra*, it is plain from the Amended Complaint that these same defendants were too remotely connected to GDC to be liable as aiders and abettors under the Land Sales Act. Likewise, the Amended Complaint fails to allege that these defendants in any way "participate[d] in the operation or management of an enterprise. . . ." *Reves*, — U.S. at —, 113 S.Ct. at 1172.[34] Accordingly, the motions to dismiss of all moving Mortgagee, Financing and Lot Contract Defendants, and of AmBase, Home and Cravath, would be granted as to Count I even if Plaintiffs had adequately pleaded that the "persons" were distinct from the "enterprise" in the Revised RICO Allegations. Even though the Amended Complaint adequately alleges that Cravath knowingly assisted or participated in the GDC fraud for Land Sales Act purposes, as discussed *supra*, *Reves* makes it clear that a higher degree of involvement in an enterprise's affairs is required to adequately allege a § 1962(c) aiding and abetting violation. Additionally, cases construing *Reves* have held that the rendering of professional services to an enterprise does not generally rise to the level of involvement required by *Reves*. *See, e.g., University of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir.1993) (accountants); *Fidelity Federal Sav. and Loan Ass'n v. Felicetti*, 830 F.Supp. 257 (E.D.Pa.1993) (real estate appraisers); *Gilmore v. Berg*, 820 F.Supp. 179, 182–83 (D.N.J.1993) (attorney and accountant). Furthermore, under the Land Sales Act a plaintiff may allege that a defendant has aided and abetted a *fraudulent scheme*, whereas under RICO a plaintiff must allege that a defendant has aided and abetted the *commission of at least two predicate acts;* the Amended Complaint satisfies the former but not the latter in its allegations against Cravath. For these reasons, it is not inconsistent that Cravath's motion to dismiss is denied as to Count III, but granted as to Count I.

■ It should also be noted that even though Ormsby is categorized in the Revised RICO Allegations as a primary violator of § 1962(c) because he served as Secretary of GDC for a period of time, there are no allegations to support a conclusion that Ormsby participated in the affairs of GDC to the extent required by *Reves;* therefore, even if plaintiffs alleged that the RICO "persons" were distinct from the "enterprise," Ormsby's motion to dismiss Count I would be granted.

■ The Revised RICO Allegations assert that all categories of officers and directors were RICO persons who participated in the affairs of the enterprise. *Reves* would not bar a RICO claim against the officers and inside directors, namely, Brown, Ehrling, Scharffenberger, Manley, Hatch and Pyne. There were sufficient allegations in the Amended Complaint that they conducted or participated in the affairs of the enterprise, GDC. *See supra* Section VI.B.2.b. *Reves*, however, would bar a RICO claim against the outside directors, namely, Askew, Clark, Si-

---

**34.** Even if plaintiffs had sufficiently alleged that these defendants participated in the affairs of the enterprise as required by *Reves*, the motions to dismiss would still be granted. In the Third Circuit, an aiding and abetting claim must be based on allegations of: (1) an independent wrong committed by a primary actor, (2) the aider and abettor's knowledge of that wrong and (3) "substantial assistance" by the aider and abettor in the achievement of the violation by the primary actor. *See, e.g., Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 791 (3d Cir.1982), *cert. denied*, 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied sub nom. First Pennsylvania Bank, N.A. v. Monsen*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1296 (D.N.J.1990). Plaintiffs' claim here clearly does not satisfy these pleading requirements. The Amended Complaint makes only conclusory allegations that defendants had general knowledge of the fraudulent GDC scheme, (*e.g.*, Am.Compl. at ¶ 375), and fails to allege how any defendant aided and abetted the commission of any predicate act or how any defendant's actions constituted "substantial assistance" of a RICO violation.

mons and Brinckerhoff, and City Defendants AmBase, Home and Carteret, because there are no allegations in the Amended Complaint from which it could be inferred that they had the requisite involvement with GDC.

### c. Statute of Limitations

In addition to moving to dismiss Count I on substantive grounds, defendants argue that most, if not all, of plaintiffs' RICO claims are time barred. Plaintiffs assert that because they "could not have known of their RICO claims against these defendants until after GDC was indicted and filed its Bankruptcy petition," Pls. 12(b)(6) Opp.Br. at 27, their claims are timely.

The Supreme Court has adopted the four year statute of limitations applicable to civil enforcement actions under the Clayton Act (15 U.S.C. § 15b) for civil actions under RICO. *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1127 (3d Cir.1988) (citing *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987)). The rule for accrual of a civil RICO action in the Third Circuit was articulated in *Keystone* as follows:

> [T]he limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of the civil RICO cause of action existed unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, in which case the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity.

*Keystone,* 863 F.2d at 1130.

Recently, the Third Circuit in *Glessner* defined the limits of what sort of injury constitutes "further injury" under *Keystone:* "... there can be separate accrual of the statute of limitations from new injuries, but [we] confine such separate accrual to 'new and independent injuries.'" 952 F.2d at 707 (footnote omitted). Thus, a later injury not new and independent from the first will not start anew the accrual period for the statute of limitations.

Plaintiffs Jose and Rosa Rolo purchased their lot from GDC by contract dated February 27, 1974. Am.Compl. at ¶ 17. Plaintiffs William and Roseanne Tenerelli purchased 12 lots and a house in various GDC communities between 1972 and 1978. *Id.* These transactions obviously took place longer than four years prior to November 8, 1990, the date on which the original complaint in this action was filed. For their civil RICO claims to be timely, plaintiffs need to allege that either (1) they became aware that the elements of a RICO cause of action existed only after November 8, 1986 (*i.e.* within four years of the commencement of the action) or (2) they sustained a "further injury" which postponed the accrual of their cause of action.

Plaintiffs have made neither of these arguments. As stated above, plaintiffs claim only that they satisfy civil RICO's four-year statute of limitations because they "could not have known of their RICO claims against these defendants until after GDC was indicted and filed its Bankruptcy petition." Plaintiffs misread the language in *Keystone*. Under *Keystone,* the statute of limitations begins to run "from the date the plaintiff knew or should have known that the *elements* of the civil RICO cause of action existed," 863 F.2d at 1130 (emphasis added). Plaintiffs do not contend that they could not have known that the elements existed; rather, they argue that they could not have known of the defendants' alleged involvement until GDC's indictment and filing under Chapter 11.

Plaintiffs' assertion that they learned they had a RICO claim against "these defendants" (presumably referring to all 35 defendants) only upon the indictment of GDC and GDC's filing for bankruptcy (in other words, on April 6, 1990) is not supported by allegations in either the Amended Complaint or in plaintiffs' opposing brief. Indeed, a review of plaintiffs' allegations leads one to conclude that plaintiffs not only *should have known* but *actually knew* of their RICO cause of action prior to April 1990 (when the indictment was filed). As the City Defendants point out, the indictment mentioned none of the defendants in this action other than

Brown and Ehrling. Similarly, the director-ships held by Scharffenberger, Manley, Hatch and Pyne were public knowledge from the date of GDC's inception as a public cor-poration in September *1985,* and their in-volvement with AmBase and City Trust and AmBase's·involvement with Carteret were likewise matters of public record. Moreover, the fact that both the Rolos and the Tenerel-lis (along with numerous other plaintiffs) filed a suit containing a RICO claim against GDC on *August 9, 1989*—more than eight months *before* GDC's indictment—demon-strates that these plaintiffs knew that the elements of a RICO cause of action existed well before GDC's indictment and filing for bankruptcy.

The sole reason offered by plaintiffs to support the assertion that their RICO claim is timely is that they learned they had a RICO cause of action only upon GDC's in-dictment in April, 1990. For the reasons stated above, this assertion is insupportable. In addition, there are no allegations in the Amended Complaint to support an inference that plaintiffs did not know that the elements of a RICO cause of action existed until after November 8, 1986 (*i.e.* within four years of the filing of the original complaint in this action). Furthermore, as discussed.in the statute of limitations analysis for Count II (securities laws), *infra* Section VI.B.4.2., the existence of public disclosure documents put plaintiffs on inquiry notice of the fraud as early as 1985—five years before this action was instituted. Finally, plaintiffs do not al-lege that they sustained any further injury which would allow them to postpone the ac-crual of a RICO cause of action. In light of the foregoing, then, plaintiffs' RICO claim would be dismissed as to all moving defen-dants on the grounds that it is time barred even if the claim were not dismissable on other, substantive grounds.

#### 4. *Securities Laws (Count II)*

Plaintiffs' securities claims are alleged in the following paragraphs of the Amended Complaint:

405. The Lots and Houses purchased were each a security within the meaning of the 1934 Act. The Lot contracts and mortgage notes issued by purchasers of Lots and Houses were each securities within the meaning of the 1934 Act.

406. The defendants have violated § 10(b) of the 1934 Act, and Rule 10b–5 promulgated thereunder, in connection with inducing plaintiffs to purchase and sell securities.

Am.Compl. at p. 166.

Section 10 of the 1934 Act makes it unlaw-ful for

any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility-of any national securities ex-change—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropri-ate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Under Rule 10b–5 it is unlawful for "any person" to do the following "in connection with the purchase or sale of any security":

(a) To employ any device, scheme, or arti-fice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the state-ments made, in the light of the circum-stances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b–5.

■ In order to plead a violation of Sec-tion 10(b) of the Securities Exchange Act and Rule 10b–5 in the Third Circuit, a plaintiff must plead that the defendant (1) made a misstatement or omission of a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which plaintiff reasonably relied, and (5) which was

the proximate cause of the injury. *See Scattergood v. Perelman,* 945 F.2d 618, 622 (3d Cir.1991); *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 296 (3d Cir.1991). Plaintiffs fail to state a claim for securities fraud because plaintiffs' transactions did not involve the purchase or sale of securities. Additionally, plaintiffs' securities claims are time barred.

### a. *The Instruments are Not Securities*

■ Section 3(a)(10) of the 1934 Act defines the term "security" as follows:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10). Plaintiffs allege that the "Lots and Houses purchased were each a security within the meaning of the 1934 Act." Am.Compl. at ¶ 405. However, land and houses clearly do not fall within this definition; plaintiffs' lots and houses, then, are not securities. The next question is whether the land or house sale *contracts* are securities. Also *considered* in this subsection is the

question whether the mortgage notes issued by plaintiffs are securities.

■ For plaintiffs' lot or house sale contracts to be considered securities within the meaning of the 1934 Act, they must pass the "investment contract" test set forth by the Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946):

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party....

In the Third Circuit, to satisfy the "common enterprise" element of *Howey,* plaintiffs must be able to show that funds were pooled and that the fortunes of each investor in the pool were tied to the success of the overall venture. *Commodity Futures Trading Comm'n v. American Metals Exchange Corp.,* 775 F.Supp. 767, 780 (D.N.J.1991), *aff'd in part, vacated in part on other grounds,* 991 F.2d 71 (3d Cir.1993), citing *Salcer v. Merrill Lynch, Pierce, Fenner and Smith Inc.,* 682 F.2d 459, 460 (3d Cir.1982). *See also Hart v. Pulte Homes of Michigan Corp.,* 735 F.2d 1001, 1004–1005 (6th Cir.1984) (affirming order dismissing securities claims because "the plaintiffs have alleged no facts showing that the fate of each purchaser's investment was tied to that of the other investors through a common scheme.")

*Howey* makes it clear that a land sale contract can, under certain circumstances, be considered an investment contract and thereby subject a seller to charges of securities fraud. More recent cases have further defined the type of relationship between a developer and a real estate community which is required to convert an ordinary land sale contract into an investment contract. These cases have held that the developer must make a commitment to manage, develop or otherwise service the plaintiff's property in a common enterprise. Under this caselaw, and in light of the allegations contained in the Amended Complaint, plaintiffs' lot and house sale contracts cannot properly be classified as investment contracts.[35]

---

**35.** Interestingly, plaintiffs themselves admit that

they "are not sophisticated speculators but lot

In *Woodward v. Terracor,* 574 F.2d 1023 (10th Cir.1978), plaintiffs bought lots as future building sites in defendant Terracor's subdivision, but several plaintiffs indicated that they themselves did not intend to build on the land and that they bought the land as an investment. *Id.* at 1025. In promoting the sales, Terracor represented that the subdivision would eventually become a self-sufficient community, after substantial development by Terracor. Plaintiffs alleged that the development was slow to progress, that Terracor had misrepresented its financial ability to carry the project through to final completion, and that Terracor's conduct violated securities fraud provisions. The court held that the land purchase contracts did not satisfy the *Howey* test for "investment contracts":

> Terracor was developing a new residential community. As part of its venture Terracor sold lots to persons who either intended to build houses thereon, or intended to resell to others who would so build. But the mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor. The only contractual agreement between plaintiffs and Terracor was the Uniform Real Estate Contract. Terracor was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met.

*Id.* at 1025. The court noted that the real estate contracts "provided only for the sale of the described parcels of land together with the usual improvements, such as culinary water, underground sewage, curb, gutter, and the like," *id.,* and distinguished the case from *Howey,* where the plaintiffs had purchased plots in an orchard along with a service contract pursuant to which the defendant was to develop and manage the orchard:

> Unlike Howey, Terracor was not under any collateral management contract with the purchasers of its land. In short, the record in the instant case simply shows the

purchase by the plaintiffs of lots in a real estate development.

*Id.*

Similarly, the court in *Davis v. Rio Rancho Estates, Inc.,* 401 F.Supp. 1045 (S.D.N.Y. 1975), stated:

> If defendants in fact built roads and other improvements, this is not the type of managerial service contemplated in *Howey....* Defendants did not promise to run the development and distribute profits to the plaintiff, as did the operators of the orange groves in *Howey.* There was no management contract between plaintiff and defendants, nor were defendants obligated by the Purchase Agreement to perform any such services.... In the absence of a 'common enterprise' between the parties, the expectation of a profit on resale is insufficient to transform what is essentially a sale of real property into the sale of an investment contract....

*Id.* at 1050. In addition, the court in *Happy Inv. Group v. Lakeworld Properties, Inc.,* 396 F.Supp. 175 (N.D.Cal.1975), found that

> [t]he *Howey–Joiner* [*SEC v. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943)] test ... requires that essential managerial efforts be made or offered by defendants. The test is not fulfilled when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services that affect plaintiffs' control and management of the land.

*Id.* at 180–81. Also, in *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1040 (10th Cir.1980), the court held that

> the obligation to perform minimal managerial functions or to provide basic improvements does not transform a real estate sale into a securities transaction. The real burden of management and development, even by the most liberal tests, must rest on the developers.

*See also De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.,* 608 F.2d 1297, 1300–1301

---

and house purchasers." Pls. 12(b)(6) Opp.Br. at 51 n. 29. This statement belies their argument

that they were investors in securities.

(9th Cir.1979) (holding that it would "extend the reach of the Securities Act too far" to find that the land sale contract at issue there met the *Howey* "investment contract" test, even though the developer's marketing materials stated that the lots would appreciate in value as a result of the development of common facilities, because (1) the land sale contract, which obligated the seller to do no more than transfer title, made no reference to an obligation on the part of the seller to develop any land and (2) the purchaser assumed complete control over the parcel which could be developed or improved as the purchaser chose).

Finally, in *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7 (1st Cir.1993), where the facts were quite similar to those in the present case, the First Circuit affirmed the district court's finding that the purchase of land by plaintiffs (purchasers of undeveloped lots in Florida) was not a security. Most of the purchasers were residents of Puerto Rico and had been approached by the real estate company's sales representatives. The purchasers were then assured by these salesmen that the undeveloped site would be an excellent investment; such oral assurances were bolstered by promotional brochures depicting sporting activities at nearby locations and other literature informing buyers of the development's progress. The projected improvements were never made, and the purchasers, whose land was worth a fraction of the purchase price, brought RICO, securities fraud and Land Sales Act claims against the real estate company, the bank that financed the company and other individuals. *Id.* at 8.

The *Rodriguez* court noted that "... one who buys raw land or even a building, hoping to profit from rents or the natural increase in the value of property, is not under normal circumstances treated as purchasing a 'security.'" *Id.* at 10 (citing *Aldrich*, 627 F.2d at 1039 n. 1). In addition, the *Rodriguez* court stated that "[c]onventional incidentals, such as the seller's promise to install a road or electricity, is similarly not enough to elevate an ordinary real estate transaction to the status of a security." *Id.* (citing *Aldrich*, 627 F.2d at 1040). The *Rodriguez* land sale contracts were found not to be securities, and the court observed that while it was "disagreeable for a court to turn away victims who have been wronged.... [it could not] disregard controlling Supreme Court decisions or distort the securities laws....," especially in light of the fact that defrauded buyers of land have a "broad gauged federal remedy" in the Land Sales Act. *Id.* at 12.

Plaintiffs correctly point out that the availability of the Land Sales Act does not preempt securities claims. Pls. 12(b)(6) Opp. Br. at 34 n. 21 (citing *Jenne v. Amrep Corp.*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,343 at 93,166 (D.N.J. Feb. 14, 1978) and *Aldrich*, 627 F.2d at 1039 n. 2). To be sure, *Howey* established that there is a point at which a land sale contract may be interpreted to be an investment contract. The *Rodriguez* court's observation does not suggest otherwise; it does, however, caution compassionate courts against creating a remedy under the securities laws (where a securities cause of action is legally untenable) simply because a plaintiff's Land Sales Act claim is, for whatever reason, defective.[36]

Plaintiffs also note that " 'a common enterprise does not require ... an entirely separable and express management contract.' " Pls. 12(b)(6) Opp.Br. at 34 (quoting *Aldrich*, 627 F.2d at 1039). In addition, they assert that promises to build a planned community are ample to convert sales of parcels into investment contracts. Pls. 12(b)(6) Opp. Br. at 34. While it is true that the absence of a management contract is not dispositive of a plaintiff's securities fraud claim, such an absence causes one to infer that, as in *De Luz Ranchos*, *supra*, the land purchaser is free to develop or improve the parcel as he or she sees fit. Such an inference suggests that there is no common enterprise (and thus no security) because (1) economic benefits will not accrue to the purchaser solely from the developer's efforts and (2) the developer lacks the requisite control over the development or management of the purchaser's land.

---

**36.** The *Rodriguez* plaintiffs' claims under the Land Sales Act were dismissed in an earlier opinion because they were time barred. *See*

*Rodriguez v. Banco Cent.*, 727 F.Supp. 759, 762–64 (D.P.R.1989).

As a result, in the absence of any contractual obligation, the *Howey* "investment contract" inquiry hinges on whether *promises* were made to develop or manage the land as a common enterprise. In other words, in a case where a plaintiff does not plead that the seller or developer is under any contractual obligation to develop or manage the property, there is a presumption that the land sale contract is not an "investment contract" within the meaning of *Howey*, and the plaintiff must plead that the seller or developer promised to develop or manage the land as a common enterprise in accordance with the *Howey* test (and the cases which have applied the test) in order to rebut this presumption.

■ Plaintiffs in the present case have failed to plead either that anyone, including GDC, had a contractual obligation to develop or manage plaintiffs' property (lots or houses) or that, by virtue of any promises made to them by GDC, their land sale contracts are investment contracts. Under the caselaw cited earlier, it is clear that a developer's promise to make basic improvements to real estate does not rise to the level of an obligation to develop or manage properties invested in as a common enterprise for profit. Consequently, such a promise does not fulfill the *Howey* "investment contract" test. Plaintiffs in this case have precluded themselves from proving that the land sale contracts at issue here constitute a "security" within the meaning of the 1934 Act because they have failed to allege any facts from which the existence of either a contractual obligation or a promise to manage or develop plaintiffs' lots in a common profit making venture could be inferred. Plaintiffs have merely alleged that GDC used "model areas" (which included "water and sewers, paved

and maintained roads, maintained drainage and other amenities and services") to induce purchasers to believe that GDC intended to develop the communities similarly (Am. Compl. at ¶¶ 74, 85(a)); that GDC represented lots would have roads, drainage and utilities and be reasonably contiguous to developed commercial areas and common recreational, school and religious facilities (*id.* at ¶¶ 78, 92); and that GDC represented the value of lots would increase as a result of improvements, the overall development of the community, and the increase in demand for lots (*id.* at ¶ 99).[37] Such allegations are insufficient to demonstrate that the land sale contracts are securities.

■ Similarly, plaintiffs' allegations preclude them from proving that their house purchase contracts are securities within the meaning of the 1934 Act. Plaintiffs state that "the fact that the houses were promoted as rental properties is sufficient to make the houses securities." Pls. 12(b)(6) Opp.Br. at 35. They rely on the SEC's Statement to Builders and Sellers of Condominiums of their Obligations Under the Securities Act, Securities Release No. 33–5347, 17 C.F.R. 231, 5347, 38 Fed.Reg. 1735 (January 18, 1973), [1972–73 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 79,163, (the "SEC Release"), to support this contention. The SEC Release states in pertinent part:

Although this release speaks in terms of condominiums, it applies to offerings of all types of units in real estate developments which have characteristics similar to those described herein.

\* \* \* \* \* \*

In summary, the offering of condominium units in conjunction with any one of the following will cause the offering to be

---

**37.** Plaintiffs cite *Miller v. Woodmoor Corp.,* [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,109 (D.Colo.1976) and *Jenne v. Amrep Corp.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,343 at 93,166 (D.N.J. Feb. 14, 1978), as examples of cases where land sale contracts were deemed to be investment contracts. In those cases, however, the promises made by the developers were much more extensive than those made to plaintiffs by GDC. *See generally Miller* (plaintiffs entered into a property maintenance agreement for the common areas controlled by the developer which provided for the payment of maintenance fees for those areas, and defendants agreed to develop a ski resort; create facilities for golfing, boating and tennis; construct a lodge, a country club and a lake by a particular completion date; and arrange publication of a newspaper for property owners); *Jenne* (defendants represented that they would be responsible for providing all of the amenities of a planned community, including utilities, swimming pools, club houses, golf courses, and other common buildings and areas).

viewed as an offering of securities in the form of investment contracts:

1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.

2. The offering of participation in a rental pool arrangement; and

3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, and must use an exclusive rental agent, or is otherwise materially restricted in his occupancy or rental of his unit.

\* \* \* \* \* \*

In all of the above situations, investor protection requires the application of the federal securities laws.

*Id.* at 82,536 and 82,539–540.

The court in *Mosher v. Southridge Assocs., Inc.*, 552 F.Supp. 1231 (W.D.Pa.1982), dismissed a count of securities fraud for failure to state a claim because the plaintiffs failed to allege sufficient facts to indicate that the transaction surrounding the purchase of the condominium at issue involved the sale of a security. Like plaintiffs' allegations regarding house purchases in the present case, the plaintiffs in *Mosher* alleged that the condominium was purchased for investment purposes, that they did not intend to use or occupy the condominium unit, that they purchased the condominium with investment intent at the encouragement of the developer based on promises that the investment would increase in value because of the developer's activities in developing, promoting or otherwise managing the investment, and that the investment was one in a common enterprise engaged in for profit. *Id.* at 1232. *See also* Am.Compl. at ¶¶ 123(d), 141.

Despite these allegations of the plaintiffs' investment intent and of the developer's promises that the investment would increase in value because of the developer's activities, the *Mosher* court found that under the SEC Release's application of the *Howey* test to the subject of condominium offers, the purchase of the condominium unit was not an "investment contract":

[W]e find certain facts in this case which take the instant transaction outside the definition of a security. First, the purchase of the condominium was not conditioned upon plaintiffs' participation in any rental program. Second, the decision to rent or not to rent the condominium notwithstanding plaintiffs' avowed intent, was within plaintiffs' sole discretion, nor were the plaintiffs, in the event they decided to rent the property, bound by the sales agreement to use a particular rental agent to let the property. Third, the agreement between the parties does not contemplate the pooling of rental payments. To that end, plaintiffs' participation in the common enterprise was limited to the actual rental obtained from the rental of their own unit. Finally, there are no restrictions here that would limit plaintiffs' right to use their unit[;] in addition, it is presumed to have been plaintiffs' responsibility to keep the unit in good repair and condition.

*Id.* at 1233. These same considerations apply equally in the present case. Plaintiffs have not alleged any facts that could lead to a conclusion that (1) the purchase of a GDC house was conditioned on plaintiffs' participation in a rental program; (2) the decision whether or not to rent their property was not within their sole discretion; (3) plaintiffs were bound to use any particular rental agent if they did indeed decide to rent their property; (4) there would be a pooling of rental payments; or (5) there were any restrictions that would limit plaintiffs' right to use their property. Moreover, plaintiffs have not alleged that they ever availed themselves of GDC's offer to provide rental services. Accordingly, plaintiffs' house purchase contracts are not securities.

Plaintiffs' allegations likewise fail to allow an inference that the mortgage notes are securities. The test for determining whether notes are securities was announced by the Supreme Court in *Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Under the *Reves* test, a note is

presumed to be a security and this presumption

> may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument. If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors.

*Id.* at 67, 110 S.Ct. at 952. The four factors are as follows:

> First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." ... Second, we examine the "plan of distribution" of the instrument ... to determine whether it is an instrument in which there is "common trading for speculation or investment".... Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction.... Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Id.* at 66–67, 110 S.Ct. at 951–52 (citations omitted).

▮▮▮▮▮ The judicially crafted list of non-securities includes notes delivered in consumer financing, notes secured by a mortgage on a home, short-term notes secured by a lien

on a small business or some of its assets, notes evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, notes which simply formalize an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized) and notes evidencing loans by commercial banks for current operations. *Id.* at 65, 110 S.Ct. at 951. *See also Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir.1976); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Under the *Reves* test, an instrument which closely resembles one of these non-securities may be deemed by a court not to be a security, thus rebutting the presumption that all notes are securities. Clearly, the mortgage notes at issue in the present case not only resemble, but are actually identical to, one of the enumerated non-securities in *Reves:* "notes secured by a mortgage on a home." Accordingly, the mortgage notes are not securities.

Plaintiffs attempt to circumvent the *Reves* mortgage notes exception by suggesting that there is a distinction between notes secured by a mortgage on a "home" and notes secured by a mortgage on a "house" or a "second home." Plaintiffs argue that the purchasers of GDC houses made such purchases "primarily as investments, not for personal consumption or living quarters for personal use as a home," Pls. 12(b)(6) Opp. Br. at 39–40, and that houses were purchased "as second houses or for eventual use at retirement, not as primary residences." *Id.* at 41. Because, according to plaintiffs, "the term 'home' is not co-extensive with 'house' or 'residential property,'" they contend that their mortgage notes were not secured by a mortgage on a *home* (as required by *Reves*), and that therefore they do not resemble the *Reves* mortgage notes exception. *Id.* at 40.

The cases cited by plaintiffs fail to support this distinction, especially in light of the rejection, in the discussion above, of plaintiffs' contention that the lot and house purchase contracts themselves are securities. According to plaintiffs, *United Hous. Found., Inc. v.*

*Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) furthers their argument. Plaintiffs emphasize that the Supreme Court in *Forman* wrote:

> What distinguishes a security transaction ... is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or *living quarters for personal use.*

Pls. 12(b)(6) Opp.Br. at 40 (quoting *Forman,* 421 U.S. at 858, 95 S.Ct. at 2063) (footnote omitted) (plaintiffs' emphasis). However, as the Mortgagee Defendants point out, plaintiffs' reliance on *Forman* in their argument regarding mortgage notes is misplaced because the *Forman* Court used the *Howey* "investment contract" test. The Supreme Court in *Reves* expressly rejected the use of the *Howey* test for determining whether notes are securities. The *Reves* Court stated: "[w]e reject the approaches of those courts that have applied the *Howey* test to notes; *Howey* provides a mechanism for determining whether an instrument is an 'investment contract.'" *Reves,* 494 U.S. at 64, 110 S.Ct. at 951.

Plaintiffs cite *Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.,* 736 F.Supp. 764 (W.D.Mich.1990), *aff'd sub nom. Schriemer v. Greenburg,* 931 F.2d 893 (6th Cir.1991), and *SEC v. Garfinkle,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,465 (S.D.N.Y. 1978), as examples of cases where notes secured by mortgages were held to be securities notwithstanding the *Reves* mortgage notes exception. In *Mercer,* however, the plaintiffs were not real estate purchasers who had *issued* mortgage notes (as in the present case) but rather investors who had *purchased* mortgage-backed notes from a broker/dealer who sold these notes on a mass market basis. The *Mercer* court found that the notes at issue there were not covered by the mortgage note exception because the exception "appl[ies] only to mortgage-backed notes in the context of a traditional face-to-face loan transaction between a borrower and commercial or consumer lender, not in the present context of a transaction between an individual investor and a broker/dealer sell-

ing the notes on a mass market basis." 736 F.Supp. at 769. Plaintiffs in the present case have not alleged any facts which suggest that the notes at issue here resulted from anything other than traditional loan transactions between a borrower and a lender.

*Garfinkle* likewise fails to help plaintiffs. The *Garfinkle* court wrote:

> Judge Friendly was very careful to limit his exceptions. For example, he did not list notes secured by a mortgage, but only those secured by a mortgage on a "home".... [T]hese notes were clearly not simple transactions, but part of a complex investment scheme. The transactions do not in any way bear a "strong family resemblance" to the exceptions listed by Judge Friendly.

[1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,465 at 93,700. The notes in *Garfinkle* did not fit into the contours of the mortgage note exception; yet, as was the case with *Mercer,* because those notes differ so greatly from the mortgage notes issued in the present case, plaintiffs' citation to these cases merely illustrates that *some* mortgage notes are securities—and fails to support the argument that *their* mortgage notes are securities. For instance, there was no indication that the mortgaged properties in *Garfinkle* were houses, as opposed to commercial properties. Additionally, the notes in *Garfinkle* were issued in a business financing context as part of a complex investment scheme. *Id.* Even if plaintiffs in the present case purchased their GDC homes with investment intent, such purchases did not constitute any complex investment scheme. They were conventional mortgage transactions.

Finally, plaintiffs cite *Singer v. Livoti,* 741 F.Supp. 1040, 1049 (S.D.N.Y.1990); unlike *Mercer* and *Garfinkle, Singer* held that the notes there were *not* securities, and plaintiffs' basis for relying on *Singer* is that the court there erred in so holding. The *Singer* court held that notes secured by real property that was being developed with luxury homes were "secured by a mortgage on a number of homes" and thus were not securities because they fit squarely within the mortgage notes exception. There is nothing

in that opinion to suggest that the reasoning behind it is unsound. Moreover, the *Singer* court went further than merely deciding that there was no meaningful distinction due to the fact that the notes were secured by mortgages on a "number of homes" rather than on a "home"; it also stated that "[i]t is hard to see why an exception for a conventional real estate mortgage should be different simply because it covered 'a home' rather than, for example, a storefront, an office building, a series of homes, or vacant land," *id.* at 1049, and called "rather foolish" the assumption that "the mortgage exception was intended to be limited only to a single family residence on a single parcel." *Id.* Because there is no substantive difference between a note secured by a mortgage on a "home" and one secured by a mortgage on a "house" or "second home," plaintiffs' mortgage notes are not securities, and resort to the four-part *Reves* family resemblance test is unnecessary.

### b. *Statute of Limitations*

Defendants also move to dismiss Count II on the grounds that most, if not all, of plaintiffs' securities fraud claims are time barred. Plaintiffs assert that their securities fraud claims are timely because they have pleaded that, "in the exercise of reasonable diligence, [they] could not have discovered and did not discover the fraud perpetrated upon them until on or shortly after the filing of the complaint here [on November 8, 1990] or the indictment and guilty plea of GDC [on April 6, 1990]." Am.Compl. at ¶ 379. Plaintiffs' allegation fails to plead compliance with the statute of limitations,[38] and therefore Count II will also be dismissed as untimely.

Section 27A of the 1934 Act, passed by Congress in December 1991, provides:

(a) ... The limitation period for any private civil action implied under section 78j(b) of this title [§ 10(b)] that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

15 U.S.C. § 78aa–1. The present action was commenced on November 8, 1990. The statute of limitations applicable in this action, then, is that announced by the Third Circuit in *In re Data Access Systems Secs. Litig.*, 843 F.2d 1537, 1550 (3d Cir.) (*en banc*), cert. denied sub nom. *Vitiello v. Kahlowsky and Co.*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988):

[T]he proper period of limitations for a complaint charging violation of section 10(b) and Rule 10b–5 is one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.[39]

The discovery need not be actual; "discovery" under the 1934 Act limitation provisions includes constructive or inquiry notice, as well as actual notice. *Menowitz v. Brown*, 991 F.2d 36, 41 (2d Cir.1993). *See also Norris v. Wirtz*, 818 F.2d 1329, 1334 (7th Cir.), cert. denied, 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987) ("[T]he time to file suit begins to run when the investor either knows or in the exercise of reasonable diligence could have discovered the facts on which the suit is based"). Accordingly, to have a timely securities fraud claim, plaintiffs here need to allege that (1) they did not know and should not have known that they had a claim for a violation of the securities laws earlier than

**38.** With respect to a claim under Section 10(b), "[p]laintiffs have the burden of proving compliance with the statute of limitations, which is a substantive rather than a procedural requirement." *Kress v. Hall–Houston Oil Co.*, 1993 WL 166274, *2 (D.N.J. May 12, 1993). In order to satisfy the discovery prong of the limitations period, a plaintiff must set forth the time and circumstances of discovery of the fraud, the reason why discovery was not made earlier, and the diligent efforts the plaintiff undertook in making such discovery. *Urbach v. Sayles*, 779 F.Supp. 351, 364 (D.N.J.1991). *See also Hill v. Der*, 521 F.Supp. 1370, 1389 (D.Del.1981); *Anixter v.*

*Home–Stake Prod. Co.*, 939 F.2d 1420, 1434 (10th Cir.1991) (because pleading compliance with the statute of limitations is "an essential ingredient to a private cause of action" under Section 10(b) of the 1934 Act, "an untimely complaint must be dismissed as a matter of law").

**39.** This one-year/three-year limitations provision applies to securities fraud cases commenced after June 19, 1991, as it was adopted by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

November 8, 1989 (*i.e.* one year before the commencement of this action) *and* (2) more than three years had not passed since the violation itself.

Plaintiffs allege that

[a]ny statutes of limitations with respect to any of the causes of action pleaded have been tolled and defendants, by virtue of their intentional fraudulent conspiracy and concealment, are equitably estopped from asserting any defense predicated upon a statute of limitations, laches, waiver or similar defense.

Am.Compl. at ¶ 384. However, like Section 1711 of the Land Sales Act discussed in Section VI.B.2.c., *supra,* the 1934 Act's one-year/three-year statute of limitations is a bifurcated limitations scheme in which the three-year "in no event" date of repose is intended to be an absolute barrier to the filing of a claim. Indeed, the *Data Access* court explained that the three-year statute of repose is absolute:

"The legislative history in 1934 makes it pellucid that Congress included statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims. It was understood that the three-year rule was to be *absolute.*"

*Data Access,* 843 F.2d at 1546 (quoting *Norris v. Wirtz,* 818 F.2d 1329, 1332 (7th Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987)) (emphasis added). That the three-year period of repose announced in *Data Access* is absolute is well recognized. *See Lampf,* 501 U.S. at ——, 111 S.Ct. at 2782 (the "3–year limit is a period of repose inconsistent with tolling"); *Cohen v. McAllister,* 688 F.Supp. 1040, 1045 (W.D.Pa.1988) (the plain language of *Data Access* requires a finding that the three-year limitations period is absolute); *Mekhjian v. Wollin,* 782 F.Supp. 881, 885 (S.D.N.Y.1992) (same); *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1391 (7th Cir.1990) (concluding that "[u]nless the 'in no event more than three' language cuts off claims of tolling and estoppel at three years ... it serves no purpose at all"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). In light of

both the legislative history behind the three-year period of repose and caselaw which has held that the period is an absolute outside limit, plaintiffs' argument regarding equitable tolling and estoppel is unpersuasive.

Even if equitable estoppel were available to plaintiffs, they have not pleaded equitable estoppel. In the Third Circuit, in order to rely on equitable estoppel a plaintiff must demonstrate that the delayed filing of a suit was caused by:

(a) an affirmative statement by the defendant that the statutory period to bring the action was longer than it actually was, or

(b) promises to make a better settlement of the claim if plaintiff did not bring suit, or

(c) comparable representations and conduct.

*Burke v. Gateway Clipper, Inc.,* 441 F.2d 946, 949 (3d Cir.1971). Furthermore, whether equitable estoppel is available to a plaintiff is a question of law to be determined by the court and plaintiff bears the burden of proving equitable estoppel. *Id.* at 948. Plaintiffs have not alleged that any defendants made any statements regarding the time for bringing the action or regarding promises relative to a settlement, or any comparable statements or representations. As a result, plaintiffs' allegations would not warrant the application of the doctrine of equitable estoppel even if the doctrine were not specifically rendered inapplicable by the *Data Access* three-year statute of repose.

As pointed out· in Section VI.B.3.c., *supra,* plaintiffs' discovery of facts constituting knowledge of the alleged violations clearly occurred no later than August 9, 1989, the date plaintiffs filed their complaint in *Rolo I.*[40] The original complaint in this action was filed on November 8, 1990—fifteen months after plaintiffs filed the *Rolo I* complaint. Because plaintiffs not only should have known, but actually knew of their securities fraud cause of action prior to November 8, 1989, they have failed to comply with the one-year limitation provision as set forth in

---

**40.** *Rolo I* contained a count of securities fraud against GDC.

*Data Access.* Their securities fraud claim here is not timely.

The dismissal of another case relating to the GDC fraud also supports the finding that plaintiffs knew or should have known of the facts constituting their securities fraud cause of action more than one year before they filed the original complaint in this action. The Second Circuit recently affirmed the district court's dismissal of an action by purchasers of GDC bonds against GDC officers and directors [41], the underwriter of the bond offering and GDC's outside auditing firm as barred by the same limitations period announced in *Data Access. In re General Development Corp. Bond Litig.,* 800 F.Supp. 1128 (S.D.N.Y.1992), *aff'd sub nom. Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993). The district court found that

> the sheer volume of pending litigation and regulatory and criminal investigations revealed in the 1988 Prospectus and subsequently filed documents could not have failed to alert an investor of ordinary intelligence to the probability of fraud and the advisability of inquiry.... [I]t appears to this Court beyond cavil that no reasonable adult reader of the 1988 prospectus and later filed documents could have remained in ignorance of the likelihood that something was severely amiss at GDC.

800 F.Supp. at 1141–42. In affirming the dismissal, the Second Circuit noted that

> plaintiffs were placed on inquiry notice of their claims by the very SEC-mandated disclosure documents they rely upon in their complaints. Released in 1988 and 1989, the documents disclosed numerous lawsuits against GDC, GDV and certain of the companies' officers, as well as civil and criminal investigations. The lawsuits and investigations, disclosed in the prospectus and other reports, concerned, *inter alia,* alleged breaches of real property installment sales contracts, alleged improper appraisal practices, alleged improper business and marketing practices, and alleged *federal and state securities law violations.* The gravity of the allegations was supported by the sheer volume of claims disclosed in the documents. For example, a 1989 10-Q report disclosed the pendency of over 80 suits, with thousands of claimants, concerning allegedly improper and fraudulent GDC sales practices. *Judge McKenna properly determined that the numerous disclosures specifically concerned the very misrepresentations alleged in the complaints, and thus placed plaintiffs on inquiry notice of probable fraud more than one year before they filed their claims in [January] 1991.*

991 F.2d at 42 (emphasis added).

These same disclosure documents also put plaintiffs in the present action on inquiry notice of probable fraud, despite plaintiffs' insistence to the contrary. Their position is belied by their own pleadings. For example, plaintiffs assert that "[t]he refusal of either Fannie Mae or Freddie Mac to allow GDC and GDV to sell their mortgages to them, as disclosed in the GDC 1985 financial statements [sic] put each defendants [sic] on notice that a fraud was being perpetrated...." Am.Compl. at ¶ 386. It stands to reason that financial documents which are alleged by plaintiffs to have put *defendants* on inquiry notice of CDC's fraud must also have put *plaintiffs* on notice of that same fraud. As the court in *Menowitz* pointed out, "plaintiffs were placed on inquiry notice of their claims by the very SEC-mandated disclosure documents they rely upon in their complaints." 991 F.2d at 42. The same is true in the present case. The Amended Complaint itself demonstrates that readily available public information concerning the fraud was available as early as *1985*—five years before the filing of the original complaint in this action and two years before the absolute three-year period of repose for actions under Section 10(b) and Rule 10b–5.

■ Given plaintiffs' reliance on GDC's public documents as evidence of defendants' purported knowledge of the GDC fraud, the Amended Complaint fails to allege sufficient facts from which an inference of reasonable

---

41. The officers and directors named as defendants by the bondholders included several defendants in the present action: Brown, Ehrling, Scharffenberger, Manley, Hatch, Pyne, Simons, Askew, Brinckerhoff and Clark.

diligence in discovering the securities fraud claim could be found. The reasonable diligence standard is an objective one for limitations purposes,[42] and as a result, plaintiffs are barred by the statute of limitations because the possibility of fraud should have been apparent to them. In short, plaintiffs' conclusory allegations that they were never put on inquiry notice, that they only learned of the GDC fraud shortly before either the filing of the November 8, 1990 complaint or the indictment and Chapter 11 proceedings of GDC in April 1990, and that they could not reasonably have learned of the fraud any earlier than they did are not substantiated by their pleadings or by basic common sense.

■ Moreover, even if plaintiffs had filed their complaint within one year of discovering the facts surrounding a claim for securities fraud, they would be barred by the three-year "in no event" date of repose. If the "violation" complained of (the purchase by plaintiffs of GDC lots and houses) is measured from the execution date of the contracts to purchase the lots and houses, this three-year limitations period has clearly been missed by several years.[43] Plaintiffs argue, however, that the "violation" should be measured not from the date of the lot sales contracts but rather from the date that the last installment payment under the lot contracts were made to GDC.[44] According to plaintiffs, the parties' obligations did not become "fixed," and the "security" (purportedly meaning the lot) was not actually sold or purchased, until title was delivered by GDC to plaintiffs upon completion of *all* the installment payments. This argument, even accepted as true, ultimately fails to help plaintiffs, though, because they have not pleaded that they continued to make any installment payments on any lot contracts up until at least November 8, 1987, *i.e.* within three years of the date of the filing of the complaint in this action.

To summarize, plaintiffs have missed both prongs of the one-year/three-year statute of limitations applicable to claims under Section 10(b) of the 1934 Act and Rule 10b–5. Additionally, under *Data Access*, the three-year period of repose is not subject to equitable tolling or estoppel and even if equitable estoppel were available, plaintiffs have not pleaded estoppel. Accordingly, Count II will be dismissed as to all moving defendants because it is time barred.[45]

### 5. *Common Law Fraud (Count VII)*

■ The dismissal of the federal claims in this lawsuit raises the question of whether jurisdiction should be retained over the state common law fraud claim. This court has the power to hear a pendent claim when the federal claims have sufficient substance, when the state and federal claims derive from a common nucleus of operative fact and are such that one would ordinarily be expected to try them all in one judicial proceeding. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16

---

42. *See, e.g., Donohoe v. Consolidated Operating & Prod. Corp.,* 763 F.Supp. 315 (N.D.Ill.1991), *aff'd,* 982 F.2d 1130 (7th Cir.1992); *Kramas v. Security Gas & Oil Inc.,* 672 F.2d 766 (9th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982); *Kassover v. Computer Depot, Inc.,* 691 F.Supp. 1205 (D.Minn.1987), *aff'd,* 902 F.2d 1571 (1990).

43. Jose and Rosa Rolo purchased their lot from GDC by contract dated February 27, 1974 and William and Roseanne Tenerelli purchased 12 lots and a house in various GDC communities between 1972 and 1978. Am.Compl. at ¶ 17.

44. This interpretation of the word "violation" can only apply to lots, and not to houses, because only the lot sales contracts were payable in installments and did not "fix" the parties' obli-

gations upon the signing of the contract. Plaintiffs' argument on this point is limited to lot purchases. Pls. 12(b)(6) Opp.Br. at 52–55. *Cf. Armbrister v. Roland Int'l Corp.,* 667 F.Supp. 802 (M.D.Fla.1987) (assuming that land constituted a "security," the absolute three-year statute of limitations begins to run, at latest, from the date of the contract, not the date of the last payment under the contract).

45. In light of the dismissal of Count II on the grounds that (1) none of the instruments at issue are securities and (2) the claim is barred by the statute of limitations, it is unnecessary to comment on defendants' arguments regarding other, independent grounds for dismissal.

L.Ed.2d 218 (1966). Pendent jurisdiction is a matter of discretion with the trial court, looking to "considerations of judicial economy, convenience and fairness to litigants," and seeking to avoid needless decisions of state law. *Id.* at 726, 86 S.Ct. at 1139.

In this case, where all three federal claims have been dismissed for failure to state a claim, there is little in the way of potential convenience or judicial economy to warrant the granting of jurisdiction over plaintiffs' state common law fraud claim. Accordingly, Count VII will be dismissed for lack of federal subject matter jurisdiction.

## VII. CONCLUSION

All defendants except Carteret Bancorp and CSB having moved to dismiss the Amended Complaint, and the court having considered the arguments and submissions of the parties, for the reasons set forth above the Amended Complaint is dismissed as to all moving defendants.